Samuel Cutrona,

*vs.*

The Mayor and Council of Wilmington, a Municipal corporation of the State of Delaware.

*New Castle, May* 9, 1924.

Municipal corporation has no power not expressly conferred by Legislature, or necessarily or fairly implied as incident to or essential for attainment of purposes expressly declared.

Under *Act General Assembly, April* 13, 1883 (17 *Delaware Laws, c.* 207), authorizing Council to regulate use of streets, and *Act General Assembly,* April 20, 1887 (18 *Delaware Laws, c.* 188), creating Board of Directors of Street and Sewer Department, with entire control of streets, resolution by board, requiring permit to operate motor busses, was justified, though such business is not specifically mentioned among those which charter authorizes Council to regulate.

City of Wilmington is not precluded from regulating operation of motor busses in streets by State motor vehicle laws, which do not indicate legislative intent to exclude city from legislating in such filed.

No one has an inherent, a constitutional right to use the public streets of a municipality as a place in which to carry on his private business.

Operation of motor busses between two cities *held* not exempt from regulation by one of them, as by requiring license for operating over its streets, because of interurban traffic.

Right to use property as owner sees fit, so long as rights of others are not infringed on, cannot be taken away by State, power of which is limited to regulation, which must operate impartially on all similarly situated, and cannot extend to point of bestowing on officials power to permit or deny enjoyment of such right as their whim, fancy or favoritism suggests, in view of Fourteenth Amendment, which denounces all such attempts, except in proper exercise of police power.

City may intrust to unregulated discretion of officials granting or denying of right to individual to use its streets for carrying on private business, such as that of operating motor buses.

Refusal of Board of Directors of Street and Sewer Department of City of Wilmington to issue new permits for operation of motor busses in streets to one who had refused or neglected to observe regulations, notwithstanding repeated warning, and who was convicted of violating regulation as to adequate brakes within period of grace allowed after expiration of former permits, *held*

justified; discretion based on personal qualifications of applicant not being offensive to Fourteenth Amendment.

INJUNCTION BILL.   The Board of Directors of the Street and Sewer Department of the City of Wilmington, on March 31, 1922, adopted a "resolution fixing the terms and conditions under which motor busses may operate on and over the streets of the City of Wilmington, and providing penalties for violation."   The resolution makes it unlawful for any person to use or occupy for the purposes of operating a motor bus any street in the City of Wilmington without first obtaining a permit to do so.   No fee or charge of any kind is exacted for a permit.   The term "motor bus" is defined in the resolution as "every mechanically propelled vehicle not operated on rails or fixed tracks which is used or engaged in the transportation of persons for hire."   Certain kinds of vehicles not necessary to mention are excepted from the terms of the definition.   Certain restrictions are laid down as to streets on which motor busses shall not operate or be parked.   In order to secure a permit, application is required to be made to the directors of the Street and Sewer Department, in which shall be set forth specified information concerning the number, type, etc., of the busses desired to be operated and a map of a proposed route.   The resolution proceeds to provide:

"Upon the filing of such application it shall be given consideration by said Board at its next regular meeting. If such application be granted, said Board shall issue such permit after the filing of the liability insurance policy hereinafter provided for."

The provisions which are required to be contained in the liability insurance policy are then set forth in detail.   Power is reserved to the board in their absolute discretion to suspend temporarily or revoke any permit whenever the board shall find that the holder of such permit, his agent, etc., has violated any of the provisions of the resolution or of any other resolution of the board regulating traffic upon, or the use of, the streets of the city or for such other cause as to the board may seem sufficient.   Whenever a permit shall be revoked, it is provided that no new permit shall be issued to its holder until after the expiration of at least one year. Detailed requirements concerning the equipment of motor busses,

their operation and maintenance, and certain traffic regulations are set forth in the resolution, and penalties are provided upon conviction before the Municipal Court for violation of any of its provisions.

Prior to the adoption of this resolution, viz., on June 19, 1919, the city had through its Council in pursuance of legislative authority (*Laws of Delaware, vol. 30, c. 127*) passed an ordinance requiring the payment of a license by every person operating motor vehicles for the transportation of passengers for fares at the rate of $50 for each vehicle. The complainant in February of 1922 applied for and secured such licenses and has ever since paid the license fee provided for under the ordinance of the Council. Upon the adoption of the resolution by the Board of Directors of the Street and Sewer Department, it thus appears that in order for a person to operate a motor bus in Wilmington he was required not only to pay a license as required by ordinance of the Council, but also to secure a permit from the Street and Sewer Department of the city. The complainant made application to the board for permits to operate three busses under the terms of the resolution. The application received favorable consideration and permits were accordingly issued to the complainant in the year 1922. Permits to him were again issued for the year 1923. The permits by the terms of the resolution expired on December 31 of each year. The complainant's busses (three in number) each have a seating capacity of eighteen persons. They are operated between the City of Wilmington and the town of New Castle. The route over which the permits authorize them to travel in the City of Wilmington is 4,132 feet from the city line to Front Street and thence for the distance of six city squares to Fourth and French Streets.

The evidence shows that the inspector of the board made numerous complaints against the complainant because of his alleged infraction of the rules and regulations laid down by the resolution of the board for the regulation of the bus business. The complainant was called before the board and warned of the consequences that would follow if his infraction of the regulations continued. He was threatened with a revocation of his permit. No action revoking the permit was however taken. On January 4, 1924, the complainant was convicted in the Municipal Court of

Wilmington and fined for having on January 3, 1924, driven his bus in the city limits while the brakes were in bad condition. The complainant made application for a renewal of his permits for the year 1924. On January 2, 1924, the board notified him that it had given long and serious thought to the subject of the renewal nd had reached the unanimous conclusion that:

"On account of the number and the seriousness of the reports and charges made to this Department against the reckless and unlawful manner in which busses of your line have been operated during the past year, for the best interest of the traveling public, your operating permits should not be renewed."

He was notified that his 1923 operating permits would be extended until January 15, 1924, at which date they would be revoked.

On January 14 the present bill was filed seeking to enjoin the city from enforcing against the complainant the provisions of the resolution of the Board of Directors of the Street and Sewer Department. A restraining order was issued and thereafter a preliminary injunction. The cause now comes on for final hearing upon bill, answer, oral testimony before the Chancellor, stipulations of the parties and exhibits.

*Clarence A. Southerland* and *Ayres J. Stockly*, for the complainant.

*Caleb S. Layton*, City Solicitor, and *James R. Morford*, Assistant City Solicitor, for the defendant.

THE CHANCELLOR. This case is to be treated as one where the directors of the Street and Sewer Department have refused to issue a permit in the first instance. The only questions agitated in the cause concern the validity of the resolution adopted by the Board of Directors of the Street and Sewer Department of the City of Wilmington. The complainant assails that resolution upon two grounds. These are:

(1) The resolution in question is beyond the charter power of the City of Wilmington, is wholly unreasonable, and is therefore void. (2) It is unconstitutional as attempting to confer unrestrained and arbitrary power upon the Street and Sewer Department.

These points will be disposed of in the order of their statement.

First.    Is the city possessed with corporate power to legislate upon the subject matter of the resolution?  The answer to this question, of course, turns upon the extent of  power which the legislative authority of the State has seen fit to confer upon the city, for a municipal corporation has no power except such as is expressly conferred by the Legislature, or is necessarily or fairly implied as incident to or essential for the attainment of the purposes expressly declared.   This principle is elementary.   It is laid down in innumerable cases and has received recognition in this State in *Coyle v. McIntire,* 7 *Houst.* 44, 30 *Atl.* 728, 40 *Am. St. Rep.* 109, and *Gray v. Wilmington,* 2 *Marv.* 257, 43 *Atl.* 94.

Turning to the statutory charter of the City of Wilmington, it appears that the act of 1883 (*Laws of Delaware, vol.* 17, *c.* 207) confers on the Council power to enact ordinances for many enumerated purposes and among these is found the power to enact ordinances "generally to prescribe and regulate the use of the highways, streets, squares, lanes and alleys of the city, and to have and exercise control over the same." *Section* 31.  The act of April 20, 1887 (*Laws of Delaware, vol.* 18, *c.* 188), created the Board of Directors of the Street and Sewer Department, upon which was conferred "entire jurisdiction and control within the limits of said city of the streets, squares, lanes, roads or alleys thereof, said jurisdiction and control to extend from building line to building line." *Section* 1.  This act further provides that the said board shall "have the same rights and powers, and be vested with the same authority over the said streets, squares, lanes, roads," etc., " *  *  * as are now held and exercised by 'the Council' of the *  *  * city *  *  * under the charter, laws, ordinances and regulations appertaining to or in any manner made for the government of said city." *Id.*

In referring to the act just mentioned, the Supreme Court of this State in *Bullock's Adm'r. v. Wilmington City Railway,* 5 *Pennewill,* 209, 64 *Atl.* 242, said:

"The purpose and object of the Street and Sewer Act was manifestly to take the whole subject-matter of the construction, and also the regulation of the use of the streets," etc., "from 'the Council,'  *  *  *  and at the same

time to give the street and sewer commissioners [directors] the power to see that the streets of Wilmington should be so constructed and *used*, so far as it lay within the power of the municipality, in a manner which would make them both fit and safe for the uses of a public highway."

It appears from the foregoing, therefore, that the legislative authority to the Street and Sewer Department respecting the streets of the city is generally to prescribe and regulate their use and to exercise entire jurisdiction and control over the same. If the resolution in question has any warrant in legislative grant, it must rest for its support on the statutory provisions just adverted to.

The complainant contends that the language referred to is not sufficiently broad to justify the passage of a resolution such as the one complained against which, he argues, must be regarded solely as undertaking to regulate the business of operating motor busses within the city limits. It is argued that the charter of Wilmington confers authority on the Council to regulate certain named business, among which the operation of bus vehicles is not mentioned, and that such being the case the business of operating busses must be regarded as never having been intended by the Legislature to be embraced within the regulatory powers of the municipality, on the principle that where an enumeration of businesses that may be regulated is contained in the statute, the enumeration is to be taken as exclusive. *Dillon, Municipal Corporations, vol.* 2, § 667.

If this principle is conceded, it can be of no avail here. This is for the reason that the right to regulate the use of the streets and the right to exercise entire jurisdiction and control over the same is among the enumerated powers of the municipality through its proper agencies. As I view the point now under consideration, it is not to be regarded as a question of whether a specific power is to be recognized when not precisely designated in an enumerated list; it is rather a question of whether a clearly granted power has been exercised in an unwarranted manner. In other words, is the attempt to regulate the business of operating busses fairly to be implied as incident to the power to regulate the use of the streets and to exercise entire control and jurisdiction over the same? If it be, then there is no occasion to resort to the principle

for which Judge Dillon is cited as an authority. I proceed, therefore, to consider whether power to pass the resolution in question is fairly to be implied from the general grant of power over the use of the streets of the city.

Very many cases have been cited in the course of the argument. Generally speaking, they are of little assistance in considering the point now under discussion, because they arise under legislative charters whose language is quite dissimiliar to the language of the Wilmington charter, and in many of them express legislative power has been conveyed to the municipality to deal with the subject of motor bus transportation.

The right conveyed to the City of Wilmington to exercise entire jurisdiction and control over the streets and generally to regulate the use of the same is couched in language of very broad import. In *St. Louis v. Western Union Telegraph Co.*, 149 *U. S.* 465, 13 *Sup. Ct.* 990, 37 *L. Ed.* 810, Mr. Justice Brewer speaking of the power given to a city to regulate the use of streets said:

"The word 'regulate' is one of broad import. It is the word used in the Federal Constitution to define the power of Congress over foreign and interstate commerce, and he who reads the many opinions of this court will perceive how broad and comprehensive it has been held to be. If the city gives a right to the use of the streets or public grounds, as it did by Ordinance No. 11604, it simply regulates the use when it prescribes the terms and conditions upon which they shall be used. If it should see fit to construct an expensive boulevard in the city, and then limit the use to vehicles of a certain kind or exact a toll from all who use it, would that be other than a regulation of the use?"

As stated by the Supreme Court of this State in *Bullock's Adm'r. v. Wilmington City Railway Co.*, *supra*, it is a power designed to secure to the inhabitants of the city protection against such a manner of using the streets as would render them unfit and unsafe as public highways. That motor busses may be used in such manner would seem to be clear. The evidence shows that the busses in question were large vehicles having a seating capacity of eighteen persons and that on one occasion, according to the inspector, as many as thirty passengers were observed therein, some of them crowded about the driver in such way as to interfere with his vision. At present nineteen busses are operating in the city. Considering their size, the amount of traffic on the city streets, the

fact that busses in their movement are not confined to any portion of the streets as are trolley cars, that their equipment and maintenance should be kept at a high standard and their operation entrusted to skillful and careful drivers, it would seem manifest that regard for the safety of those who ride in the busses as well as consideration for the safety, convenience and rights of others using the highways would suggest a logical relation between the business of operating them and a regulation of the use of the streets.

No man has the right to use the public streets as a place wherein to carry on his private business. The streets are not constructed and maintained by the public for the purpose of supplying sites and facilities for carrying on private occupations. If it were otherwise, vendors of goods might with justice protest against all attempts to exclude them from the streets in the prosecution of their various businesses, notwithstanding the rights of the traveling public were being interfered with and traffic thereby obstructed. This complainant in the operation of his busses was engaged in using the streets of the city for the prosecution of a private business conducted thereon. So far as I have been able to discover the authorities are overwhelming to the effect that he has no inherent, no constitutional, right to carry on such a business. *Houston v. Des Moines*, 176 *Iowa*, 455, 156 *N. W.* 883; *Greene v. San Antonio*, (*Tex. Civ. App.*) 178 *S. W.* 6; *Schoenfeld v. City of Seattle*, (*D. C.*) 265 *Fed.* 726; *Cummins, et al., v. Jones*, 79 *Or.* 276, 155 *Pac.* 171; *Frick v. City of Gary*, (*Ind.*) 135 *N. E.* 346; *Dent v. Oregon City*, 106 *Or.* 122, 211 *Pac.* 909; *Ex parte Dickey*, 76 *W. Va.* 576, 85 *S. E.* 781, *L. R. A.* 1915F, 840; *Ex parte Parr*, 82 *Tex. Cr. R.* 525, 200 *S. W.* 404; *Harris v. Atlantic City*, 73 *N. J. Law*, 251, 62 *Atl.* 995.

If this be so, I am unable to escape the conclusion that the power to regulate the use and exercise entire jurisdiction and control over the streets carries with it as a necessary implication the power to completely interdict a use which the streets were never intended to serve. The power existing to prohibit absolutely, and there being no requirement that it shall be exercised, it follows as a corollary that power also exists to permit the use. When this is said, terms and conditions upon which permission will be granted may be imposed, and those terms and conditions may very reason-

ably be such as concern the manner in which the proposed business shall be conducted. If this view be correct, then the matter presents itself not as an attempt primarily to regulate a business, but rather as an effort to do so in a secondary sense and only as incidental to the main purpose, which is to regulate the use of the streets over which entire jurisdiction and control are vested in the regulating body.

In *Greene v. San Antonio, supra,* it appears that the authority of the city to regulate the jitney business was based on a grant of authority from the Legislature to exercise "exclusive control and power" over the streets. In sustaining the right of the city to pass the regulating ordinance there in question the court said:

"When the charter gave the exclusive control of the streets to the city of San Antonio, it necessarily gave it the authority to require reasonable conditions upon which the use of the streets should be granted. By the grant of exclusive control of the streets, there was necessarily given, by implication, power to require of any one who desired to operate a dangerous agency upon the streets the giving of some guaranty for the protection of the lives and limbs of citizens. If the city has the right to the performance of certain conditions before a license to use the streets would be given, it could require any reasonable condition."

On a motion for a rehearing the court in that case further said:

"Appellant desired to use the streets for private purposes of gain, and the city has the absolute right to prohibit the use of the streets for his private business, and in case it gave permission for such use had the right to compel the payment of a license fee."

In *West, et al., v. City of Asbury Park,* 89 *N. J. Law,* 402, 99 *Atl.* 190, the validity of an ordinance regulating the operation of auto busses, etc., was questioned on the ground of a lack of legislative authority to the city. In answer to this contention the court said:

"We think all the provisions [of the ordinance] we have recited are well within the express powers given to the council or within the powers necessarily inferred from the general clause. That like powers may be implied from the general control of streets has long been settled. We need refer only to the leading case of *Commonwealth v. Stodder,* 2 *Cush.* 562."

I am referred by the solicitors for the complainant to numerous cases which they cite in support of their contention under the

present head.   Those cases upon examination do not appear to me to be in conflict with the views hereinbefore expressed.   They are cases in which such questions as the following are considered: Whether power to require a license for revenue purposes carries power to regulate, or prohibit;  whether an ordinance regulating a business or imposing a license tax is supported by the so-called general  welfare clause of a municipal charter;  and whether power to regulate a business conveys authority to prohibit it.   The principle involved in those cases is not involved here.   Nor are those cases in point which hold that where the paramount legislative authority of the State has been directed to the subject-matter of the ordinance in such way as to indicate that it was the legislative intent to assume exclusive control, the city is ousted of its jurisdiction.   The complainant makes the contention here that the State in the enactment of various laws dealing with motor vehicles and their use has recognized the rights of automobiles whether for hire or for personal use to be operated over the highways of the State, and that the City of Wilmington is consequently excluded from legislating in this field.   I find nothing in these acts which indicates such to have been the legislative intent.   *Irwin v. Atlantic City*, 90 *N. J. Law*, 99, 100 *Atl.* 565.

Thus far we have arrived at the conclusion that the City of Wilmington, by virtue of its power generally to regulate the use of its streets and to exercise entire jurisdiction and control over the same, has the power to regulate or even prohibit the use of the streets by operators of motor busses.   But if this be so, yet it is urged by the complainant that this power can extend only to the limits of the city, it cannot reach beyond the city boundaries and lay its hands on busses which are operated in an interurban traffic, and that inasmuch as the bus line of the complainant is engaged in such a traffic it is therefore not within the power of the city to touch it.

In this connection complainant cites *Argenta v. Keath*, 130 *Ark.* 354, 197 *S. W.* 686, *L. R. A.* 1918B, 888.   In the report of that case in L. R. A. 1918B, 888, will be found an annotation of cases dealing with the power of cities over interurban transportation by vehicles used for hire.  The *Argenta Case* is however clearly distinguishable from the instant one.   It holds that where the

State has by statute regulated the use of motor vehicles and provided that no other license shall be exacted for the privilege of using the public streets, except that municipal corporations may make ordinances, rules and regulations affecting motor vehicles which are used "within their limits for public hire," no power exists in the municipality to require a license to be paid by the operator of a bus line passing through the municipality in the course of conducting an interurban traffic between two other cities. The decision turns on the construction placed upon the words of the statute granting to municipalities the permissive right to legislate touching motor vehicles used "within their limits." These words were construed to refer to intra-city operation. No such question is involved here.

Furthermore, the *Argenta Case* is to be regarded as a case dealing with the subject of licenses imposed upon the right to transact business, which is not the case here. There is no attempt made by the ordinances of Wilmington to impose a license tax on a business done partly in Wilmington and partly outside. The question therefore of whether a city, under a power to exact license fees and taxes from those doing business within the city, can so use its power as to give it an extra-territorial application is not here involved. The distinction between imposing a license or tax upon a transportation business conducted partly, if not almost entirely, outside the city limits and imposing conditions for the privilege of using the city streets in the course of such business is very clear. The result reached by the court in *Commonwealth v. Stodder*, 2 *Cush.* 562, 48 *Am. Dec.* 679, is a practical recognition of this distinction, and the cases of *In re Smith*, 33 *Cal.* 161, 164 *Pac.* 618, *Carterville v. Blystone*, 160 *Mo. App.* 191, 141 *S. W.* 701, and *Joplin, etc., Co. v. Carterville*, 160 *Mo. App.* 186, 141 *S. W.* 705, expressly recognize it.

*Dent v. Orgeon City, supra*, is another case cited by the complainant involving interurban transportation. In that case the city undertook by ordinance to prohibit any interurban public utility vehicle to operate over the streets without a franchise granted by ordinance. The court held the ordinance void because it appeared manifest that the design of the ordinance was to impose the requirement of permission to operate over its streets

upon common carriers operating between points outside of the city. Such of course is not this case. The court, however, deemed it unnecessary to pass on the question of whether power to entirely prohibit interurban carriers from using the streets was conferred on the city. This was because of certain state legislation. The result of the case is therefore of no value here.

The bus line operated by the complainant has its termini in Wilmington and New Castle. His busses come up into the city, stop to take on and discharge passengers, and make free use of that portion of the city streets necessary for him in conducting the Wilmington end of his business. His is not the case of one who merely passes through a city which is intermediate between two removed termini. I am cited to no authority which holds that the regulation of a business of the kind he conducts on the streets of Wilmington is exempt from the city's regulatory power on the ground of its interurban nature.

The point first made by the complainant is not only that the resolution in question is beyond the charter power of Wilmington and therefore void (a contention which for the foregoing reasons I am unable to accept), but also that it is void because wholly unreasonable. Inasmuch as the only particular in which the resolution is said to be unreasonable is in this, viz., that the right to issue permits is left to the unrestrained and arbitrary will of the Street and Sewer Department, and as this aspect of the case is embraced in the second and last contention, it will be disposed of under that head which will now be considered.

Second. Is the resolution unconstitutional as attempting to confer unrestrained and arbitrary power upon the directors of the Street and Sewer Department? A reading of the resolution discloses that the matter of issuing permits is left in the discretion of the directors. No rules are laid down upon compliance with which the directors are bound to issue permits. Is the resolution invalid for that reason?

Before answering this question, it is proper to observe that many cases which at first blush might appear to assist the complainant in this connection are upon further consideration in no wise applicable. As before observed, the conducting of a busines upon the streets of a city is not a thing to which any one can assert

an inherent right. This is the pivotal proposition upon which the complainant's case turns. The right of dominion over one's own property, to use it as he sees fit so long as the rights of others are not infringed upon, is a right which not even the legislative power of the State can take from the individual. With respect to such proprietary interests the extent of the State's power is that of regulation, and such regulation must be of a kind that operates impartially alike upon all persons similarly situated. Regulation in matters of this kind can never extend to the point of bestowing upon any official or officials the power to permit or deny, according as whim, fancy or favoritism may suggest, the enjoyment of the right by the individual. The equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States denounces all attempts to subject the property rights of individuals to the unrestrained discretion or control of administering officials, except in those special instances where the police power of the State may within the appropriate field reserved to it interpose its restraining arm.

In *Yick Wo v. Hopkins*, 118 *U. S.* 356, 6 *Sup. Ct.* 1064, 30 *L. Ed.* 220, the decision was that the right of a person to use his building for the purpose of carrying on a laundry business in the city of San Francisco could not be made to depend on the unrestrained will of the city's board of supervisors. The laundry business being of such character as calls for no special treatment similar to that, for instance, which the business of selling intoxicating liquors renders necessary, it was held that regulation was the limit of legitimate power and that such regulation must be equal and impartial in its application. Right to conduct the business could not be left to be granted *ex gratia*. Though *Fisher v. St. Louis*, 194 *U. S.* 361, 24 *Sup. Ct.* 673, 48 *Ed.* 1018, appears to be in conflict with at least the language of *Yick Wo v. Hopkins*, yet the doctrine of the latter case is sustained by an overwhelming weight of authority both in the Federal and State courts. Many of the cases in the states are cited in a note to *Section* 118 of the Article on Municipal Corporations in 19 *R. C. L.* It is unnecessary to refer to these cases in detail. The doctrine referred to is applied to all businesses which are legitimate in character and of such nature as to indicate that the right to pursue them is inherent in the individual. Ac-

cordingly judicial countenance is denied to all attempts to require the citizen to secure the consent of officials, who may give or withhold at their pleasure, before he may do such things with his own property as the following: Build on his own land, *Hays v. Poplar Bluff*, 263 *Mo.* 516, 173 *S. W.* 676, *L. R. A.* 1915D, 595; *State v. Tenant*, 110 *N. C.* 609, 14 *S. E.* 387, 15 *L. R. A.* 423, 28 *Am. St. Rep.* 715; *City of Sioux Falls v. Kirby*, 6 *S. D.* 62, 60 *N. W.* 156, 25 *L. R. A.* 621; *Bostock v. Sams*, 95 *Md.* 400, 52 *Atl.* 665, 59 *L. R. A.* 282, 93 *Am. St. Rep.* 394; *Boyd v. Frankfort*, 117 *Ky.* 199, 77 *S. W.* 669, 111 *Am. St. Rep.* 240; keep horses, etc., on his own premises, *Hagerstown v. Baltimore, etc., R. R. Co.*, 107 *Md.* 178, 68 *Atl.* 490, 12 *Am. St. Rep.* 382; set up steam engines, *Baltimore v. Radecke*, 49 *Md.* 230, 33 *Am. Rep.* 239; *Montgomery v. West*, 149 *Ala.* 311, 42 *South.* 1000, 123 *Am. St. Rep.* 33, 13 *Ann. Cas.* 651, 9 *L. R. A.* (*N. S.*) 659; or store petroleum thereon, *Richmond v. Dudley*, 129 *Ind.* 112, 28 *N. E.* 312, 13 *L. R. A.* 587, 28 *Am. St. Rep.* 180; use a building for storing , etc., rags, *Commonwealth v. Maletsky*, 203 *Mass.* 241, 89 *N. E.* 245, 24 *L. R. A.* (*N. S.* ) 1168; or establish a cemetery on his own lot, *Los Angles v. Hollywood Cemetery Association*, 124 *Cal.* 344, 57 *Pac.* 153, 71 *Am. St. Rep.* 75. All such cases concern themselves with the inherent right of the individual to assert his proprietary interest over his own possessions.

In the instant case, however, no such situation is presented. This is for the reason, as already pointed out, that no person has any proprietary interest in the city streets. He has no inherent right to make of the streets a place for the transaction of his private business. Accordingly the case of *Yick Wo v. Hopkins*, *supra*, and all cases following its doctrine have no application here. Nor have those cases any application which deny to a city the power to commit to the unrestrained will of officials the right of private citizens to parade over the streets. *In re Frazee*, 63 *Mich.* 396, 30 *N. W.* 72, 6 *Am. St. Rep.* 310; *State ex rel. Garrabad v. Dering*, 84 *Wis.* 585, 54 *N. W.* 1104, 19 *L. R. A.* 858, 36 *Am. St. Rep.* 948; *Anderson v. City of Wellington*, 40 *Kan.* 173, 19 *Pac.* 719, 2 *L. R. A.* 110, 100 *Am. St. Rep.* 17. Whether cases of this class be correct in principle or not, I need not pause to consider. Conceding their correctness, they are inapplicable here for

the manifest reason that they in no wise involve the use of the streets for carrying on a business.

This case comes down to the proposition of whether it is competent for the City of Wilmington to intrust to an unregulated discretion the right of an individual to use its streets as a place for the carrying on of his private business. After giving to the question the fullest consideration I can, I am of the opinion that it is. Whenever the city authorities have power to prohibit a thing, they may as a condition for its enjoyment require that the consent of its properly designated officials shall first be obtained. This is the rationale of the decision in *Quincy v. Kennard, et al.*, 151 *Mass.* 563, 24 *N. E.* 860, and is the principle that underlies the class of cases within which the licensing of whiskey saloons falls. In the *Quincy-Kennard Case* the suit was for an injunction to restrain the defendant from exercising the employment of keeping swine within the limits of the town without first having obtained a permit from the board of health. To the objection that the prohibition in the order passed by the board of health was qualified by the words "without a permit in writing first obtained from the board of health," the court replied:

"We are at a loss to see how it affects the validity of the order, that the board expressly reserved to themselves a power to do what they could have done even if the prohibition had been absolute, or how the defendants are put in a worse position by the order contemplating the possibility that the board of health may grant them a written permit, than if it had excluded that possibility."

"Furthermore," said the same court in *Commonwealth v. Parks*, 155 *Mass.* 531, 30 *N. E.* 174, "what the municipal body may forbid altogether, it may forbid conditionally, unless its written permission is obtained beforehand. We see nothing in *Newton v. Belger*, 143 *Mass.* 598, or in *Yick Wo v. Hopkins*, 118 *U. S.* 356, and *Baltimore v. Radecke*, 49 *Md.* 217, to make us doubt the correctness of the decision in *Quincy v. Kennard*, 151 *Mass.* 563."

In a later Massachusetts case, *Commonwealth v. Davis*, 162 *Mass.* 510, 39 *N. E.* 113, 26 *L. R. A.* 712, 44 *Am. St. Rep.* 389, affirmed in *Davis v. Mass.*, 167 *U. S.* 43, an appeal was taken from a conviction for violating an ordinance which forbade the making

of a public address in or upon any public ground of Boston except in accordance with a permit. The following is from the language of the opinion in that case:

"When no proprietary right interferes, the Legislature may end the right of the public to enter upon the public place by putting an end to the dedication to public uses. So it may take the lesser step of limiting the public use to certain purposes. * * * It is settled also that the prohibition in such an ordinance, which would be binding if absolute, is not made invalid by the fact that it may be removed in a particular case by a license from a city officer, or a less numerous body than the one which enacts the prohibition. *Commonwealth v. Ellis*, 158 *Mass.* 555, 557."

In the case of *Commonwealth v. Ellis*, 158 *Mass.* 555, 33 *N. E.* 651, cited in the foregoing excerpt, a conviction was sustained for violation of an ordinance forbidding any person except in accordance with a permit from the superintendent of streets from selling any goods or articles in any street of Boston. The court held that the city council had power to forbid selling on the streets, and—

"This being so, the ordinance is none the worse for the exception in case of a permit from the superintendent of streets" (citing *inter alia Quincy v. Kennard, supra*).

The Court of Criminal Appeals of Texas has held in *Ex parte Sullivan*, 77 *Tex. Cr. R.* 72, 178 *S. W.* 537, and *Ex parte Bogle*, 7 *Tex. Cr. R.* 1, 179 *S. W.* 1193, that the discretionary right to grant or refuse a license to operate a jitney does not invalidate an ordinance prohibiting the operation of jitneys without a license.

If the conclusion heretofore reached, viz., that the citizen has no inherent or proprietary right to use the streets for the prosecution of his private business is correct, then the fact that the municipality chooses to provide for exceptions to a general prohibition in favor of those to whom it grants consent, is not, under the principle of the foregoing cases, open to objection. It is true that such a situation is exposed to the danger of favoritism and prejudice. The evidence in this case, however, fails to indicate that these factors have operated to the prejudice of the complainant. He was permitted to run his busses for nearly two years before the consent was withheld. The board justifies its refusal to issue new permits by the fact that the complainant notwithstanding repeated warnings refused or neglected to observe the regula-

tions. They evidently regarded him as an unfit person to be allowed to operate his busses over the traffic laden streets of the city. During the period when he was allowed fifteen days of grace within which to operate after his 1923 permits had expired, he was convicted in the Municipal Court for violating the regulations with respect to adequate brakes, a particular in which great care ought to be exercised. Considering the dangers and hazards to which the public is exposed by the use of large busses, it is not unreasonable for the directors in control of the streets to take into consideration the character of the applicant for a permit before granting the same. Under the old method of regulating the business of selling intoxicating liquors by a license system, it was repeatedly held that discrimination based on personal fitness was permissible. The business of selling liquor being such as might be prohibited entirely, just as the business of operating busses might in the instant case be likewise prohibited, the principle is equally applicable in both cases that discretion based on the personal qualifications of the applicant is not offensive to the Fourteenth Amendment. Indeed, even where the right to keep a cow stable is concerned (a case manifestly more debatable than either of those just mentioned) the Supreme Court of the United States in *Fisher v. St. Louis, supra*, recognized the right of the city to authorize the issuing or withholding of permits according to the personal fitness of the applicant.

It would hardly be reasonable to hold that granting the right to establish a system of permits, one must be granted to every applicant regardless of his fitness. The resolution under which the complainant obtained his 1923 permits provided for a revocation of the same in case of a conviction in the Municipal Court for the offense of violating any of the regulation. In *Quigg v. State*, 84 *Fla.* 164, 93 *South.* 139, where it was held by a divided court that under the language of the charter of the city of Miami there was no power in the municipality to totally forbid the operation of jitneys on certain named streets, the majority opinion concedes that it would be an allowable regulation to exclude from the use of the streets jitney drivers who had violated permissible regulations. If so, ought this court in the face of the complainant's

conviction before the Municipal Court, practically compel the city by way of injunction to grant him a permit?

The complainant has cited several cases which he relies upon as sustaining his objection to the resolution as being invalid because of its arbitrary and discriminatory provision with respect to the issuance of permits. A review of these cases will not be undertaken. It will suffice to say with respect to them that some are distinguishable on the facts, and in others the pertinent language of the opinion is obiter or in the reasoning of the court too little weight is accorded the principle that the right to transact private business on the streets is permissive and not inherent in its nature.

The bill must be dismissed with costs on the complainant, and a decree will be entered accordingly.

NOTE.—An appeal to the Supreme Court was taken by the complainant, and thereafter a motion was made in this court to stay an order for dissolution of the preliminary injunction pending determination of the appeal. At the hearing of this motion a question was raised as to the proper judicial officer to approve the appeal bond. The opinion of the Chancellor in disposing of the motion and approval of the appeal bond is reported *post p.* 262 and the opinion of the Supreme Court affirming the decree of the Chancellor is reported *post. p.* 434.