MIGUEL ALERS, Petitioner, *v.* SUPERIOR COURT OF PUERTO RICO, SAN JUAN PART, J. M. ALMODÓVAR ACEVEDO, JUDGE, Respondent.

No. 3.   Decided October 13, 1961.

*Benjamín Ortiz* for petitioner. *J. B. Fernández Badillo, Secretary of Justice, Arturo Estrella, Assistant Secretary of Justice, Edgar S. Belaval, Assistant Attorney General, M. B. Carrasquillo, Ernesto C. Blanco, José Freyre Díaz, Waldo Santiago,* and *Lydia F. Marcos* for the Public Service Commission.

Division composed of Mr. Justice Santana Becerra, as Acting Chief Judge of Division, and Mr. Justice Blanco Lugo and Mr. Justice Dávila.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

By resolution of January 17, 1957, the Public Service Commission issued to the petitioner herein a certificate of necessity and convenience to operate three omnibuses on the Loíza-Carolina route. On February 8, or 22 days later, "La Cubanita Auto Bus," which had appeared prior thereto to oppose the granting of the franchise, filed a motion for rehearing. On the following February 18 the petitioner filed a memorandum in opposition to the claims of "La Cubanita." The Commission set both questions for hearing, and in the meantime it stayed the order of January 17.

Section 75 of the "Puerto Rico Public Service Act" (27 L.P.R.A. § 224) provides a period of 15 days for applying for reconsideration of any finding, determination, or order of the Commission. Relying on this provision of the Act, the petitioner herein raised opposition to the granting of the rehearing requested by "La Cubanita," alleging that its application was made untimely. The order of the Commission, we have seen, was dated January 17 and the application for rehearing was dated February 8. This notwithstanding, the

Commission heard evidence on the opposition by "La Cubanita." The evidence tended to show that the petitioner did not comply with certain laws relating to chauffeurs, and upon deciding the case and setting aside the order of January 17 the Commission stated as follows:

"In view of the circumstances of this case as well as the evidence offered by both parties, the Commission is of the opinion that in disposing of the case it is necessary to consider, in addition to the existence or nonexistence of public convenience and necessity, the evidence offered by the opposing party on petitioner's actions in connection with the chauffeurs' social security laws in force and the mandatory decrees of the Minimum Wage Board. An analysis of the evidence discloses that petitioner's actions prior to the filing of his application are in contravention of the provisions of the Chauffeurs' Social Security Act and mandatory decrees, a legislation having such a high social scope that compliance therewith should not be evaded by any public carrier, since in any grant made by this Commission it is the duty of the grantee not only to comply with our regulations, but also with any other laws enacted by the Commonwealth of Puerto Rico."

The petitioner appealed to the Superior Court, San Juan Part, seeking review of the Commission's determinations. The Superior Court affirmed, and thereupon he appealed to this Court by a petition for certiorari, which we issued.

In support of his appeal, he alleges that the motion for rehearing made by "La Cubanita" was untimely filed, and that the Commission could not consider any factors other than necessity and convenience in passing upon the request of the petitioner herein.

■■ Let us first consider the question of belatedness in filing the application for rehearing. Section 75 of the Public Service Act, *supra*, provides:

"After any finding, determination or order shall have been made by the commission, any public-service company or municipal corporation affected thereby, or any party complainant in the proceedings, or any person, municipal corporation or

public-service company, or association duly permitted by the commission, on proper petition and cause shown to intervene may apply, within fifteen days after the service of said order, for a hearing in respect to any matter determined by the commission in or by its hearing or investigation and order issued therein..."

In view of the clear and conclusive terms of the transcribed provision, it is clear that the motion filed by "La Cubanita" was belated. However, "the commission shall have the power to rescind or modify findings, determinations or orders made under the provisions of this part, upon such notice and in such manner as it shall deem proper, and may grant rehearing for cause shown," as provided by § 73 (27 L.P.R.A. § 222) of the Act. Relying upon this provision, the Commission could *motu proprio* hold a rehearing to consider additional questions in connection with the determination it had made of issuing a certificate of necessity and convenience to the petitioner herein.

Such has been the construction placed upon a similar provision in the State of Pennsylvania from which the petitioner himself admits our law was taken. The law of that state, like ours, requires that petitions for reconsideration must be filed within 15 days after service of the order. Section 1006 of the Public Utility Law, Pa. Stat. Ann., Tit. 66, § 1396 (1959). But, as in the case of our § 73, § 1007 of the Act *supra* (§ 1397 of the Annotated Statutes) provides:

"The Commission may, at any time, after notice and after opportunity to be heard as provided in the case of complaints, rescind or amend any order made by it."

In the case of *Paradise* v. *Pennsylvania Public Utility Commission*, 132 A.2d 754 (Pa. 1957), the court had under consideration a situation similar to that before us. May the Commission hold a rehearing when the petition therefor is filed after the statutory time limit? In passing upon the question, the court stated as follows:

"We agree with appellant that § 1007 does not authorize the Commission to breathe life into a belated petition for rehearing under § 1006. However, the filing of such a petition cannot limit the Commission's authority to take independent action under § 1007. The line of demarcation between a rehearing under § 1006 and an independent inquiry by the Commission under § 1007 may frequently be very faint, and we are unwilling to fetter the power of the Commission merely because of unfortunate terminology. The real issue on this appeal is whether the requirements of § 1007 have been observed."

And what § 1007 does require, as does § 73 of our Act, is that a rehearing be held, and that was what the Commission did here. As in Pennsylvania, the provisions of § 75 of our Act can not limit the Commission's authority to take action under § 73.

In treating the question of the power of administrative agencies to review at any time their orders and resolutions, support is sought in an article appearing in Wis. L. Rev. 5, at p. 19 (1942):

"In general the same principles are applied by the public utility commissions. Frequently such commissions enact rules of practice prescribing a limited period within which an aggrieved party may apply for a rehearing or reopening of the case. Such rules do not limit an otherwise existing continuing jurisdiction of the commission and it may, upon its own motion, reconsider a case even though such period has elapsed." Schopflocher, *The Doctrine of Res Judicata in Administrative Law*, Wis. L. Rev. 5 (1942).

See, also, *Toledo Edison Co.* v. *Public Utilities Commission*, 118 N.E.2d 531 (Ohio 1954) ; *Pittsburgh & L.E.R. Co.* v. *Public Utilities Commission*, 191 N.E. 467 (Ohio (1954), *Froeber-Norfleet* v. *Southern Ry. Co.*, 9 F. Supp. 409 (D.C.N.D. Ga. 1934).

The Commission had authority to reopen the case for the purpose of considering the question raised before that agency, the fitness of the person to whom a certificate of public convenience was being issued. At this point we stop to consider

the other questions raised by the petitioner to the effect that, in granting a certificate of necessity and convenience, the Commission can not take into consideration the character and conduct of the applicant. The petitioner cites authorities in support of his position. *Librizzi* v. *Plunkett*, 16 A.2d 280 (N.J. 1940); *Bradley* v. *Arizona Corporation Commission*, 141 P.2d 524 (Ariz. 1943); and a Pennsylvania case, *Slater* v. *Penn. Public Utility Comm'n*, 98 A.2d 743 (Pa. 1953). In the latter case the grantee had been operating under a certificate issued to a partnership of which he was a partner and which had been dissolved, but continued to comply with the orders and regulations of the Public Service Commission of Pennsylvania. Bearing this in mind, the Commission issued a certificate in his name, and, on appeal, the opposing party alleged that the same should not have been issued because he had violated the law by continuing to operate under the partnership's certificate. The Commission was of the opinion that this violation did not warrant the refusal of the certificate applied for because he had always complied with the orders and regulations. The court held that there was nothing to justify the disturbance of the Commission's findings, and this is what that case actually decides, since its policy was to uphold them unless they were arbitrary and without support in the evidence. And in the instant case the finding was not arbitrary and was supported by the evidence.

■ Yet, irrespective of the decisions of other jurisdictions in that respect, it seems that the Commission under its power to regulate public transportation not only can, but should, take into consideration the fitness of those seeking to perform a public service regulated by the Commission. Regardless of the necessity for performing a transportation service, it would be inconceivable if the Commission were compelled to issue a certificate of necessity and convenience to an applicant who violates the law. That an agency which

regulates the issuance of certificates of necessity and convenience may scrutinize the fitness of an applicant, has been upheld in the State of Pennsylvania, *Byham* v. *Pennsylvania Public Utility Commission*, 67 A.2d 626 (Pa. 1949); *D. F. Bast, Inc.* v. *Pennsylvania Public Utility Comm'n*, 138 A.2d 270 (Pa. 1958); and in other jurisdictions, *Cutrona* v. *Mayor and Council*, 124 Atl. 658 (Del. 1924); *Alspaugh* v. *Public Utilities Commission*, 65 N.E.2d 263 (Ohio 1946). See, also, 1 Blashfield, Cyclopedia of Automobile Law & Practice § 473 (1948 ed.).

The violations charged to the petitioner herein and found proved by the Commission bear on the nonpayment of the chauffeurs' social security and noncompliance with the mandatory decrees of the Minimum Wage Board. But the fact is that it is something more than mere failure to comply with the provisions of certain laws highly characterized by social justice which directly affect those persons who work for the holder of a certificate of necessity and convenience. It is the attitude assumed by the petitioner whenever an inspector of the bureau charged with the enforcement of one of those laws calls on him for the purpose of investigating the matter. The inspector sees the petitioner and the latter informs him that the omnibuses belong to his brother. The brother then informs him that they belong to the petitioner. It is his attitude in attempting to evade compliance with the law. In this connection, the inspector testified:

"What I want to say to the Commission, as a public officer, is that Miguel Alers says that he does not own buses, that they belong to Juan, and when I see Juan he says that they do not belong to Juan but to Miguel, and I have been compelled to resort to the courts."

■ What guarantee would the Commission have that the petitioner would comply with the orders and regulations of the Commission? Even those which relate to public security. Obviously, the test should not be that the Commission has

authority to exact compliance therewith. Is it by any chance that there are no persons who comply with them willingly? In the performance of public services, preference should always be given to those persons who abide by the law. It is a guaranty for all.

██ There is no basis to hold that the trial court erred in upholding the Commission's finding. Recently, in *Public Service Commission* v. *Metro Taxicabs, Inc.*, 82 P.R.R. 967 (1961), we said that the function of the court of instance in these cases "is exclusively judicial: to determine whether in the light of the facts and other circumstances present in the certified record to be weighed, the decision of the Commission was or not reasonable, in conformity with the law, and based on competent evidence." Could it be held that the decision of the Commission in the case at bar is not reasonable and that it is not based on competent evidence? And in the *Metro* case we ratified: "The Court shall not substitute the Commission." In upholding the judgment of the trial court, once again we ratify that criterion.

The errors assigned by the petitioner were not committed. The writ issued will be quashed.

Mr. Justice Santana Becerra dissented in a separate opinion.

---

MR. JUSTICE SANTANA BECERRA, dissenting.

On August 19, 1955, Miguel Alers appeared before the Public Service Commission urging the approval of the transfer, for reasons of health, to his brother Juan Alers of five certificates of necessity and public convenience, four of which serviced the Loíza-Carolina route and the Boca de Cangrejos-San Juan route via Fernández Juncos. Juan Alers died shortly thereafter. After several proceedings and hearings, the Commission treated the case as an original application for a franchise to operate on those routes. Finally,

on December 11, 1957 it entered an order refusing definitively the transfer requested on the following grounds:

"In view of the circumstances of this case as well as the evidence offered by both parties, the Commission is of the opinion that in disposing of the case it is necessary to consider, in addition to the existence or nonexistence of public convenience and necessity, the evidence offered by the opposing party on petitioner's action in connection with the chauffeurs' social security laws in force and the mandatory decrees of the Minimum Wage Board. An analysis of the evidence discloses that petitioner's actions prior to the filing of his application are in contravention of the provisions of the Chauffeurs' Social Security Act and mandatory decrees, a legislation having such a high social scope that compliance therewith should not be evaded by any public carrier, since in any grant made by this Commission it is the duty of the grantee not only to comply with our regulations, but also with any other laws enacted by the Commonwealth of Puerto Rico.

"Regarding the necessity and convenience of the service, the evidence was entirely conflicting. While the petitioner attempted to justify such convenience and necessity by his witnesses, the opposing party attempted to show by its evidence that at present the means of transportation along the Loíza-Carolina route is adequately serviced."

The San Juan Part of the Superior Court confirmed the order and the case reached this Court.

I have nothing to oppose to the view stated in general terms by my brothers of the Division in the sense that, "Irrespective of the decisions of other jurisdictions in that respect, it seems that the Commission under its power to regulate public transportation not only can, but should, take into consideration the fitness of those seeking to perform a public service regulated by the Commission." However, as is always the case with the general principles, the difficulty arises when we are compelled to confront specific situations. We have before us a specific case.

The problem presented is more serious than it seems at first blush. The orders of the Commission must be "in con-

formity with law." Sections 83 and 85, Act No. 70 of 1917 (Sess. Laws, p. 432). Up to what point may the Public Service Commission, not within its general quasi rule-making power, but within its quasi-judicial function of adjudicating the rights of a petitioner, sanction, *in the absence of a provision of law*, the noncompliance with other laws and refuse a grant to which there would otherwise be a right—other than those cases in which the noncompliance would cover things which are substantially comprised in the grant itself as, for example, the public security in the case of a carrier—is the basic problem confronted in this case. The lawmaker has at times provided that the nonobservance of the law shall have effect in other areas, and of this we have numerous situations.[1]

At the present time in which practically every type of enterprise and economic activity is closely supervised by regulations of law in its different phases of relation, the concept of fitness acquires a broad meaning. What is accepted as good in this case of a carrier could arise in connection with any other type of business or by reason of any other modality of nonobservance. Could a franchise be refused to an enterprise on the ground that it has been charged with or found guilty of nonpayment of taxes or some other similar violation? Could a franchise for a water connection be refused to a sugar mill, for example, because it has failed to comply with the Sugar Act with respect to the due payment to its colonos or otherwise, or which in some way has failed to observe the provisions of the Employment Security Act in that industry? Could it be refused because the petitioning enterprise is or has been charged with unfair labor

---

[1] Thus, for example, for nonpayment of the inheritance tax, in addition to the specific sanction provided for the particular situation, an administrator is precluded from dividing the property, a judge from approving it, a registrar from recording it, etc. An excellent illustration is given in § 11 of Act No. 130 of 1945 (Sess. Laws, p. 406, 29 L.P.R.A. § 72).

practices before the Labor Relations Board, or because it has been charged with or found guilty of not paying minimum wages, etc., in its other relations subject to regulation? I am in no position to give a categorical answer, nor is there any need at this time, because, even in the position of law taken by the Commission, its decision, in my opinion, is not reasonable nor in conformity with law on the face of the record. However, it does not escape my mind that the matter may have at least, once it is sanctioned today, consequences with which we shall have to cope in the future.

In view of the petition for transfer of the five certificates, the Commission ordered its attorney to make a study of the records, it appearing from the report submitted on August 10, 1956 and from the attorney's testimony given at a subsequent hearing that the situation of such records was very confusing, the certificates had expired since 1947 and 1949, and that only two, which had been transferred to Juan Alers, and two vehicles had been operating recently. In fact, to the petition there was attached copy of two public-omnibus licenses for 1955-1956 issued by the Secretary of Public Works in the name of Juan Alers. In view of the report, on September 5, 1956 the Commission ordered that a second hearing be held and that notice of the petition be served on other carriers for the purpose of determining whether the transfers requested should be approved and the service resumed thereunder. "La Cubanita Autobus Co., Inc." filed a written opposition alleging, among other things, that the vehicles which the petitioner claimed were his had been withdrawn, that only one was operating irregularly and unsafely, that the service was suspended frequently for different reasons; that the vehicles did not belong to Juan Alers, but were operated by the petitioner, and that in view of their wretched condition and other reasons the Commission should cancel definitively the said certificates. At a hearing held on October 3, 1956, at which the presiding commissioner stated

that the petitioner should prove that those buses had always belonged to him, although they appeared in the name of Juan Alers, and the necessity and convenience of the service, the petitioner admitted those facts in his testimony.

On October 17, 1956, subsequent to the aforesaid hearing, the Commission ordered its Inspection Bureau to make a study of the passenger movement on the Loíza-Carolina route. The three inspectors who made the study submitted a report on December 5, 1956 recommending, for reasons of necessity of the service, the approval of the petition for transfer and the restoration of those authorizations which were being used recently. On January 17, 1957, the Commission issued an order concluding that there was public necessity and convenience and that it should authorize more means of transportation by bus on the said route, and granting to the petitioner, "who is an old carrier with great experience in this service," a three-year franchise to operate three buses on the Loíza-Carolina route. It granted him 15 days to submit time schedules and rates under which he would operate, and that the franchise would be drawn up and submitted to the Governor after such schedules were submitted.

On February 5, 1957, the petitioner submitted the time schedules and rates. On February 8, 1957, carrier "La Cubanita Autobus Co., Inc." applied for a rehearing alleging that it had not had an opportunity to read the Inspection Bureau's report and that the grant was contrary to law. A rehearing was set on March 6, 1957.[2]

The last hearing was held on March 27, 1957, at which abundant evidence was produced by either party on the necessity and convenience of the service applied for. The

---

[2] It appears from the record that on March 19, 1957, Salvador Caro, Executive Director of the Port Authority, sent a letter to the Chairman of the Commission informing him, in addition to other facts, that there did not exist a real necessity for the service which the petitioner proposed to offer. This letter evidently was not notified to the petitioner, nor did the Port Authority appear at the hearing to oppose.

entire proceeding was commenced and treated as a proceeding for the transfer of the certificates already issued. However, in the course of the hearing the Chairman of the Commission stated that the case was being treated as an original petition of necessity and convenience. The opposing party, "La Cubanita Autobus Co., Inc.," called to the witness stand the inspector of the Chauffeurs' Social Security Bureau, who testified that since 1953 he had approached the petitioner and his brother Juan Alers in connection with the chauffeurs' social security, requiring of one as well of the other compliance with the Act of 1950 establishing such security, and that neither of them had complied; that according to a list furnished to him by the Commission in 1950, it appeared that the petitioner owned five permits and that he never contributed for the chauffeurs employed by him. That when he decided to resort to the courts, Miguel Alers had told him that he never operated buses and that they were his brother's property. On the other hand, Juan Alers informed the witness that the buses belonged to the petitioner; that as a result of a certain family transaction, they had appeared before the Commission and transferred the buses and that he was not bound to comply with such requirement of law. The witness submitted a report to the Social Security Bureau, an investigation was conducted and it was found that Miguel Alers had transferred the certificates, and an action was brought in the Superior Court against Juan Alers to compel compliance with the law. At the death of Juan Alers the case was pending before the court to be prosecuted against the heirs. The witness further testified that the Commission evidently had issued five permits to Miguel Alers, who did not comply with the law until a chauffeur told him in October 1956 that Juan Alers had employed him to operate a bus, and that the petitioner informed him that in order to avoid a suit, since his brother already had a case in court, he was going to fill up his income and pay the amount

corresponding to the two chauffeurs whom he mentioned. At this point of the examination, the Chairman of the Commission intervened and explained to the witness that according to the report the petitioner had operated two buses from 1946 to 1950 and later got rid of the vehicles, and that as of 1950 the buses appeared in the name of Juan Alers. As respects wages, a witness mentioned three cases, one against the petitioner, another against the brother, and the other against both of them, involving, according to his weak recollection, vacation and overtime under Decree No. 12. He said that judgment was entered in one of them against the petitioner.

Not long ago the Court voiced an unequivocal opinion on the freedom of the Public Service Commission to make its decisions, which should not be disturbed unless they are not reasonable, are not in conformity with law, and are based on incompetent evidence. *Public Serv. Comm'n v. Metro Taxicabs*, 82 P.R.R. 967 (1961). Apart from changing the nature of the proceedings, the Commission, in my opinion, merely imposed on the petitioner a specific sanction for the alleged noncompliance—particularly since the question of noncompliance was *sub judice* before a court at that time— with another act which prescribes its own sanctions and on things which, as I pointed out, are not consubstantial with the franchise itself such as would be an insurance on the equipment or security measures. There are judicial protections regarding this aspect.[3] Nor do I believe that the Com-

[3] Section 9 of Act No. 428 of 1950 (Sess. Laws, p. 1038), establishing the chauffeurs' social security, as it read in December 1957, imposes on the employer the duty to pay and withhold, etc. An employer who has failed to pay the assessments may be sued for the amount of the benefits awarded to the chauffeur plus an equal sum by way of penalty. According to § 10, as it read, the Secretary of Labor shall have the right to recover from the employer the assessments which he has failed to pay plus an equal sum by way of damages, etc. Section 13 declares that the noncompliance with that Act or its regulations shall be deemed to be a misdemeanor punishable by a maximum fine of $1,000, imprisonment in jail for one year, or by both.

mission's refusal would be reasonable because of the fear or suspicion of not having any guarantees that the petitioner would comply with its orders. In addition to the fact that this amounts to assuming in advance the violation of the order as a factor of the decision, the Commission has adequate sanctions for noncompliance with its orders.

The trial court did not in fact base its judgment on the considerations stated by the Commission. It stated that the latter had specifically concluded that the evidence was conflicting as to the necessity and convenience of the service, and that the subsequent denial of the petition and revocation of the certificate issued was tantamount—the court concluded—"to resolving the conflict in the evidence adversely to the appellant." It then assumed that what the Commission said did not render the order void. The difficulty in the *inference* drawn by the trial court lies in the fact that the Commission refused to grant the franchise expressing certain views, and, on the contrary, refrained from making any conclusion on the necessity and convenience of the service on which hinged almost the entire evidence. Hence, if the actual situation and true reason for the decision could have been the inference drawn by the trial court, the case should be remanded to the Commission to make the pertinent conclusions on the necessity and convenience.

I must not close without saying that Act No. 85 of June 14, 1960 (Sess. Laws, p. 151) amended § 10 of Act No. 428 of 1950 (Sess. Laws, p. 1038), in the sense that "the cases where enterprises engaged in public transportation service have been sentenced for noncompliance with the obligation to pay the assessment required by law shall be reported to the Public Service Commission of Puerto Rico for its consideration when such enterprises appear before it in proceedings related to their certificates of necessity and convenience."

Even though the purpose of that amendment were applied to a decision made two and one-half years ago prior to its adoption, the fact remains that the lawmaker prescribed the reasonable condition, and also the safeguard, that the enterprise *must have been sentenced* for noncompliance.

For the foregoing reasons, I must dissent.