# Staunton.

## TAYLOR v. SMITH.

September 18, 1924.

1. ORDINANCES—*Motor Bus Licenses—Examinations of Applicant by Super-intendent of Police—Delegation of Arbitrary Power.*—A city ordinance provided that no person should operate a motor bus on the streets of the city until he appeared before the superintendent of police and passed an examination as to his ability to operate an automobile and his knowledge of the traffic laws, and should have satisfied the superintendent of his character and qualifications.

   *Held:* That the ordinance was not invalid as delegating to the super-intendent of police a purely arbitrary power.

2. ORDINANCES—*Motor Bus Licenses—Examinations of Applicant by Super-intendent of Police—Delegation of Arbitrary Power.*—An ordinance provided that no one should operate a motor bus upon the city streets until he had stood an examination before the superintendent of police "as to his ability to operate an automobile, and as to his knowledge of the traffic laws of the State and of the city," and had satisfied "the superintendent of police of his character and qualifications," and when he had done this, it was made the duty of the superintendent of police to give him a certificate to that effect. The plain inference was that it was the duty of the superintendent of police to issue the certificate to all who successfully passed the exami-nation and satisfied him as to "character and qualifications."

   *Held:* That this was far from investing the superintendent with a purely arbitrary or whimsical discretion. What is vested in the superintendent is a sound discretion founded on the facts and cir-cumstances of the particular case.

3. PUBLIC OFFICERS—*Discretionary Powers—Rules and Regulations.*—Rules and regulations cannot always be made in advance for the guidance of administrative and executive officers in the execution of discre-tionary powers vested in them. The very nature of the power conferred may forbid it, as in the instant case, where the question is one of "character and qualifications." It is not always necessary that the statutes and ordinances prescribe a specific rule of action, but, on the other hand, some situations require the vesting of some discretion in public officials, as, for instance, where it is difficult

or impracticable to lay down a definite, comprehensive rule, or the discretion relates to the administration of a police regulation and is necessary to protect the public morals, health, safety, and general welfare.

4. ORDINANCES—*Motor Bus Licenses—Examinations of Applicant by Superintendent of Police—Appeal from Superintendent—Appeal not a Constitutional Right.*—A city ordinance provided that no person should operate a motor bus until he had passed an examination before the superintendent of police as to his qualifications and character and received a certificate from the superintendent. No appeal was expressly given from the decision of the superintendent of police, but the right of appeal to a higher tribunal is not a constitutional right.

5. MUNICIPAL OFFICERS—*Police Power—Discretion of Officers and Performance of Duties.*—A city may, in the execution of its police power, invest its administrative and executive officers with a reasonable discretion in the performance of duties devolved upon them to that end, whenever it is necessary for the safety and welfare of the public. Such a discretion is neither arbitrary nor capricious.

6. STATUTES—*Arbitrary and Capricious Powers of Officers—Where Power to Prohibit Exists.*—Arbitrary and capricious powers are contrary to the genius of our government, are never favored and seldom granted. But, where the power exisits to prohibit the doing of an act altogether, there necessarily follows the power to permit the doing of the act upon any condition, or subject to any regulation, however arbitrary or capricious it may be, as the greater power includes the less.

7. CONSTITUTIONAL LAW—*Inherent Rights which may not be Surrendered.*—There are certain inherent rights which men do not surrender by entering into organized society, and of which they cannot be arbitrarily deprived by the State. They are briefly summarized in general terms in section 1 of the Constitution of 1902. They embrace all businesses that are legitimate in character, and are of such nature as to indicate that they are inherent in the individual claiming them. But this doctrine has no application to the inhibition or regulation of that which the claimant has no inherent right to do.

8. STREETS AND HIGHWAYS—*Right to use Streets by Common Carriers is not an Inherent Right.*—The right to use the streets of a city as a common carrier for hire is a privilege and not an inherent right, and may be granted or refused by the city, in the exercise of its police power, at its pleasure. The right of the State, in the exercise of its police power, to prohibit the use of the streets as a place of private business or as the chief instrumentality in conducting such business is established. The power to prohibit includes the power to regulate and

where the power to prohibit exists the reasonableness of any regulation is a legislative question.

9. MANDAMUS—*Public Officers—Discretionary Powers.*—Mandamus does not lie to control a discretionary power vested in any functionary. Therefore, mandamus does not lie to a superintendent of police by an applicant for a certificate to operate a motor bus where the granting of the certificate lies within the discretion of the superintendent.

Error to a judgment of the Corporation Court of the city of Roanoke, upon application for mandamus. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*R. C. Jackson,* for the plaintiff in error.

*Hughson & Showalter,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

The council of the city of Roanoke passed an ordinance regulating the operating of motor busses on the streets of the city, and amongst other things forbade anyone to operate such busses unless and until he had first obtained a permit and a license so to do.

Section 7 of the ordinance is as follows: "No person shall operate, and no owner shall allow or permit any agent or employee to operate, any such vehicle until he shall have appeared before the superintendent of police and passed an examination as to his ability to operate an automobile and as to his knowledge of the traffic laws of the State and of the city, and shall have satisfied the superintendent of police of his character and qualifications, and shall have a certificate from the superintendent of police to that effect; provided, how-

ever, that the superintendent of police shall not approve any application for such certificate to any person who is under the age of eighteen years.''

The defendant in error, R. C. Smith, applied to the superintendent of police for a certificate under section 7, but he refused it. Thereupon Smith applied to the corporation court of the city for a mandamus to compel the superintendent to issue to him the certificate. The city demurred to the petition for the mandamus, but the court overruled the demurrer and awarded the writ.

The power of the city over its streets and the right to regulate their use is not called in question, but section 7 is assailed on the ground that the power conferred on the superintendent of police is purely arbitrary, and not regulated by any uniform rule of action. The petition, after reciting the enactment of the ordinance, sets forth section 7 in full, and states the petitioner's case as follows:

''That petitioner has heretofore been operating a motor bus or taxicab in the city of Roanoke, Virginia; that in pursuance of said ordinance above mentioned, and of the clause above set forth, petitioner applied to the superintendent of police for the city of Roanoke, Virginia, for a certificate under said ordinance to operate a taxi cab as driver, but was refused said certificate, basing his refusal upon the fact that petitioner had been fined in police court for the following violations: First, speeding (one time); second, for driving without having first obtained a permit; third, for fighting.

''Petitioner claims, and therefore avers and charges, that the above matters were not such as would go to the question of his moral character, and that the superintendent of police should not have refused to grant the certificate when the same was requested, that said section of the ordinance is invalid.''

Two questions present themselves for our consideration: (1) Was the power delegated to the superintendent of police purely arbitrary; and (2), if so, did the city have the right to delegate it?

[1, 2] By section 7 the applicant is required to stand an examination before the superintendent of police "as to his ability to operate an automobile, and as to his knowledge of the traffic laws of the State and of the city," and to satisfy "the superintendent of police of his character and qualifications," and when he has done this, it is made the duty of the superintendent of police to give him a certificate to that effect. This is the preliminary step to be taken by the applicant. After he has done this, section 3 of the ordinance declares, "every person desiring such permit and license shall make application to the city manager of the city of Roanoke on printed forms to be prescribed and furnished by said city manager, in which form shall be stated: (a) Name and residence or office of applicant; (b) The number, type, State license number and carrying capacity of each motor bus proposed to be operated; (c) The route over which it is proposed to operate such motor bus; (d) During what hours it is proposed to operate; (e) That no driver shall be employed who has not passed the examination required by ordinance.

"The application shall be signed by the applicant, if an individual; if a firm, by some member thereof; and if a corporation, by its president, treasurer, or secretary." Section 4 then provides that he shall give bond, with a guaranty or surety company as surety, and states what the condition of the bond shall be and who may sue thereon. The application and bond must be approved by the city manager, and when so approved and the certificate of approval is duly certified by the city clerk, it is provided that the "commissioner of the revenue shall issue to such applicant a license to ope-

rate such motor bus," etc. The plain intimation, in fact the necessary inference, is that it is the duty of the superintendent of police to issue the certificate to all who successfully pass the examination and satisfy him as to "character and qualifications." This is far from investing the superintendent with a purely arbitrary or whimsical discretion. Indeed, the petition shows on its face that the application was not refused arbitrarily, but for good cause, to-wit, because the applicant had been convicted three times for violating the ordinances of the city, two of which related to the operation of automobiles, and the other to peace and good order. There is no allegation or suggestion in the petition that a certificate had been refused by the superintendent of police to any other person, arbitrarily or otherwise. But the conclusion is reached that the superintendent acted arbitrarily because he refused him a certificate for the reasons stated, and that such action was authorized by section 7, and hence "said section of the ordinance is invalid." This conclusion was not admitted by the demurrer, and was not warranted by the facts.

It must be conceded that knowledge of the traffic laws of the State and of the city, and that the applicant shall be a person of suitable character and qualifications to fill the position, are wise precautions for the safety and welfare of the public; and that the authority to ascertain these facts should be vested somewhere. But the fact that it is vested in the superintendent of police, or other administrative officer, and that no fixed rules are prescribed for his governance does not confer upon such officer an arbitrary authority to act as he pleases without regard to the rights of others. What is vested in him is a sound discretion, founded on the facts and circumstances of the particular case, and to be exercised with a due regard to the rights

of the applicant as well as the public. Such a discretion is frequently vested in courts and judges, often not subject to review, and with no guaranty of its honest exercise except the character of the man who exercises it. The discretion vested in the officer is what is called in some of the cases a reasonable discretion. It is in its nature judicial.

[3] Rules and regulations cannot always be made in advance for the guidance of administrative and executive officers in the execution of discretionary powers vested in them. The very nature of the power conferred may forbid it, as in the instant case, where the question is one of "character and qualifications."

In *Hall* v. *Geiger-Jones Co.*, 242 U. S. 539, 37 Sup. Ct. 217, 61 L. Ed. 480, L. R. A. 1917-F, 514 Ann. Cas. 1917-C, 643, where an applicant for a license to deal in corporate securities was required to satisfy the commissioner that he was a person of "good repute," it was said: "Reputation and character are quite tangible attributes, but there can be no legislative definition of them that can automatically attach to or identify individuals possessing them, and necessarily the aid of some executive agency must be invoked. The contention of appellees would take from government one of its most essential instrumentalities, of which the various National and State Commissions are instances."

The authorities on this subject are too numerous to discuss, but in a valuable note in 12 A. L. R. 1435, 1447, citing many cases, it is said: "It is also well settled that it is not always necessary that the statutes and ordinances prescribe a specific rule of action, but on the other hand, some situations require the vesting of some discretion in public officials, as, for instance, where it is difficult or impracticable to lay down a

definite, comprehensive rule, or the discretion relates to the administration of a police regulation and is necessary to protect the public morals, health, safety and general welfare." Cases are cited from California, Georgia, Illinois, New Hampshire, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island and Wisconsin.

In *Lieberman* v. *Van De Carr*, 199 U. S. 552, 26 Sup. Ct. 144, 50 L. Ed. 305, an ordinance forbidding milk dealers to act as such "without a permit from the board of health, and subject to the conditions thereof," was upheld on the ground that the ordinance only conferred upon the board of health such reasonable discretionary powers as were necessary to protect the public health.

In *Engle* v. *O'Malley*, 219 U. S. 128, 31 Sup. Ct. 190, 55 L. Ed. 128, the court upheld a statute of New York (Laws 1910, c. 348, §25), requiring certain private bankers to obtain a license from the State Comptroller as a prerequisite to the right to do business, although the statute provided that "the comptroller may approve or disapprove the application in his discretion," and provided no guide for the exercise of the discretion. The basis of the decision is public safety as disclosed by the facts of the case, and it was held that the power vested in the comptroller was not arbitrary and capricious, but that he was "expected to act for cause," and that the "power of the State to make the pursuit of a calling dependent upon obtaining a license is well established, where safety seems to require it."

In *Gundling* v. *Chicago*, 177 U. S. 183, 20 Sup. Ct. 633, 44 L. Ed. 725, the court sustained an ordinance of the city of Chicago requiring a license of dealers in cigarettes which could only be obtained upon satisfying the mayor that the applicant "is of good character and

reputation and a person suitable to be entrusted with the sale of cigarettes." The court, after referring to the holding in *Yick Wo* v. *Hopkins*, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, that "there was a clear and intentional discrimination made against the Chinese in the operation of the ordinance, which discrimination was founded upon the difference of race, and was wholly arbitrary and unjust," said: "The ordinance in question here does not grant to the mayor arbitrary power such as is described in the above mentioned laundry case, but the provision is similar to that mentioned in the foregoing extract from the opinion in that case. In the case at bar, the license is to be issued if the mayor is satisfied that the person applying is of good character and reputation and a suitable person to be entrusted with the sale of cigarettes, provided such applicant will file a bond as stated in the ordinance, as a security that he will faithfully observe and obey the laws of the State and the ordinances of the city with reference to cigarettes. The mayor is bound to grant a license to every person fulfilling these conditions, and thus the fact of fitness is submitted to the judgment of the officer, and it calls for the exercise of a discretion of a judicial nature by him. There is no proof nor charge in the record that there has been any discrimination against individuals applying for a license, or any abuse of discretion on the part of the mayor."

In *Mutual Film Corporation* v. *Industrial Commission*, 236 U. S. 239, 35 Sup. Ct. 387, 59 L. Ed. 552, Ann. Cas. 1916-C, 296, the court had under review, and sustained the validity of a statute of Ohio (103 Ohio Laws, p. 400, §4) which left to the judgment and discretion of the board of censors of motion pictures the determination of what pictures were "of a moral, educational, or amusing and harmless character." In the course of

the opinion it was said: "The next conclusion of complainant is that the Ohio statute is a delegation of legislative power and void for that if not for the other reasons charged against it, which we have discussed. While administration and legislation are quite distinct powers, the line which separates exactly their exercise is not easy to define in words. It is best recognized in illustrations. Undoubtedly the legislature must declare the policy of the law and fix the legal principles which are to control in given cases; but an administrative body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply. If this could not be done, there would be infinite confusion of the laws, and in an effort to detail and particularize, they would miss sufficiency both in provision and execution.

"The objection to the statute is that it furnishes no standard of what is educational, moral, amusing, or harmless, and hence leaves decision to arbitrary judgment, whim, and caprice; or, aside from those extremes, leaving it to the different views which might be entertained of the effect of the pictures, permitting the 'personal equation' to enter, resulting 'in unjust discrimination against some propagandist film,' while others might be approved without question. But the statute by its provisions guards against such variant judgments, and its terms, like other general terms, get precision from the sense and experience of men, and become certain and useful guides in reasoning and conduct. The exact specification of the instances of their application would be as impossible as the attempt would be futile. Upon such sense and experience, therefore, the law properly relies. This has many analogies and direct examples in cases, and we may cite *Gundling* v. *Chicago*, 177 U. S. 183, 44 L. Ed. 725, 20 Sup. Ct. Rep.

633; *Red 'C' Oil Mfg. Co.* v. *Board of Agriculture,* 222 U. S. 380, 56 L. Ed. 240, 32 Sup. Ct. Rep. 152; *Monongahela Bridge Co.* v. *United States,* 216 U. S. 177, 54 L. Ed. 435, 30 Sup. Ct. Rep. 356; *Buttfield* v. *Stranahan,* 192 U. S. 470, 48 L. Ed. 525, 24 Sup. Ct. Rep. 349. See also *Waters-Pierce Oil Co.* v. *Texas,* 212 U. S. 86, 53 L. Ed. 417, 29 Sup. Ct. Rep. 220. If this were not so, the many administrative agencies created by the State and national governments would be denuded of their utility, and government in some of its most important exercises become impossible."

In *State* v. *Cohen,* 73 N. H. 543, 63 Atl. 928, a statute was upheld which granted to certain State officials the right to issue licenses to persons "deemed by them to be suitable to be dealers in junk." Pub. St. N. H. 1901, c. 124, sec. 1, as amended by Laws 1905, c. 76. It was held that this was not an arbitrary and uncontrolled power, but only vested in said officials a reasonable discretion in determining who were suitable persons, and was a valid execution of the police power of the State. On this subject it was said: "The theory on which the statute was framed was that the protection which it was thought the public required would be obtained by allowing 'suitable persons' only to engage in the business and have it distinctly known where the business was to be transacted. To carry the theory into effect, it was necessary to clothe some one with authority to determine who were 'suitable persons,' persons possessing the requisite sobriety, integrity and respect for the welfare of the community, to be safely entrusted with the control of a business having such possibilities of danger to the safety and welfare of the public. The legislature delegated the performance of this duty to the mayor and aldermen and selectmen. These officers were not to license per-

sons generally or such persons as they saw fit, but only 'suitable persons.' There is nothing in the statute having the least tendency to show an intention that there was to be any discrimination among 'suitable persons,' or that any persons were to be adjudged unsuitable except those who, in the conduct of the business, would defeat, or attempt to defeat, the purpose of the legislature in requiring a license. All suitable persons who applied were to have licenses. The provision was not intended as a grant of arbitrary power, but only as the imposition of a duty upon those officers, to be performed by an impartial exercise of a reasonable discretion. There can be no doubt of the legislature's power to delegate the duty to these officers, and by so doing they violated no provision of the Constitution.''

In *Racine* v. *District Court*, 39 R. I. 475, 98 Atl. 97, it was held that an ordinance authorizing the city clerk, upon the approval of the chief of police, to issue licenses to drivers of motor busses who were deemed suitable persons to drive such busses, was not invalid because it conferred on the officers named an unbridled discretion in issuing or refusing to issue licenses as it cannot be presumed that the discretion will be abused.

*Yee Bow* v. *Cleveland*, 99 Ohio St. 269, 124 N. E. 132, 12 A. L. R. 142, was a laundry case, and before license could be issued the health commissioner was required to ascertain whether the sanitary and drainage arrangements were sufficient to protect the public health, and whether adequate ventilation, plumbing and draining facilities had been provided. It was claimed that these matters were left to the arbitrary judgment of the health commissioner, with no fixed standard to guide his action, and hence it was illegal. On this

subject the court said: "It is exceedingly doubtful whether a fixed standard could be adopted by the city in its regulation of those features. But it is now generally held that discretionary powers may be lodged in administrative officers to determine whether the terms of a law or ordinance of this character have been complied with, and that such 'terms, like other general terms, get precision from the sense and experience of men.' "

It was further said: "It is now generally held that *quasi* judicial duties and administrative functions may be imposed upon administrative officers for the purpose of acertaining the conditions under which the law or ordinance becomes effective. It will not be presumed that the action of the administrative officer will be either arbitrary or unwarranted. Should it so prove to be, the aggrieved person would have the right to relief through the courts."

*Block* v. *Chicago*, 239 Ill. 251, 87 N. E. 1011, 130 Am. St. Rep. 219, was a motion picture case, in which a city ordinance was upheld which required persons who desired to exhibit moving pictures to first exhibit them to the chief of police who was to determine whether they were immoral or obscene, and if they were to refuse to permit them to be exhibited. It is said in the opinion: "It is also argued that the ordinance is void because it delegates legislative and judicial powers to the chief of police by giving him the power to determine whether a picture or series of pictures is immoral or obscene, and not giving to the applicant for a permit a day in court for the determination of the question whether the picture or series of pictures is immoral or obscene. It is true that a legislative body cannot divest itself of its proper function to determine what the law shall be, but it may

authorize others to do those things which it might properly, but cannot understandingly or advantageously do. That rule was stated as long ago as the case of *People* v. *Reynolds*, 5 Gilm. 1, where it was said that without that power legislation would become oppressive and yet imbecile, and that local laws, almost universally, call into action to a greater or less extent the agency and discretion either of the people or individuals to accomplish in detail what is authorized or required in general terms. Government could not be carried on if nothing could be left to the judgment and discretion of administrative officers, and the doctrine of that case has been steadily adhered to ever since. * * * It has never been questioned that power may be delegated to officers to determine facts, such as whether animals are diseased so as to exclude them from importation; whether meat or food is found upon an inspection to be unhealthy or diseased; whether an assemblage amounts to a riot to be dispersed. There are numerous facts of that kind which must be left to administrative officers, and the ordinance is not invalid because the chief of police must determine the question of fact whether a picture or series of pictures is immoral or obscene.

"But it is said that, conceding the power of the legislative body to authorize an administrative officer to determine the question, the ordinance fixes no standard by which it is to be determined. Manifestly it would be impossible to specify in an ordinance every picture or particular variety of picture which would be considered immoral or obscene, and no definition could be formulated which would afford a better standard than the words of the ordinance. It is doubtless true, as said by counsel, that there are people who differ upon the subject as to what is im-

moral or obscene. There are the shameless and unclean, to whom nothing is defilement, and from whose point of view no picture would be considered immoral or obscene. Perhaps others could be found, with no laxity of morals, who pay homage to art, and would not regard anything as indelicate or indecent which had artistic merit, and would look upon any person entertaining different sentiments as of inferior intelligence, without proper training on the subject and blinded with bigotry. Both classes are exceptional, and the average person of healthy and wholesome mind knows well enough what the words 'immoral' and 'obscene' mean, and can intelligently apply the test to any picture presented to him. There is a great diversity of opinion as to what constitutes good moral character, but it is beyond question that an officer authorized to grant a license to keep a dram shop may determine whether the applicant has a good moral character, and there has been no ground for the complaint that the power has been wrongfully or oppressively exercised against applicants. It is presumed that the chief of police, or the mayor, in case of an appeal to him, will perform his duty with reasonable intelligence and in accordance with the generally accepted meaning of the words."

Many other cases might be added to the same effect.

[4] It is true that no appeal is expressly given from the decision of the superintendent of police, but the right of appeal to a higher tribunal is not a constitutional right.

[5] We are of opinion that a city may, in the execution of its police power, invest its administrative and executive officers with a reasonable discretion in the performance of duties devolved upon them to that end, whenever it is necessary for the safety and wel-

fare of the public. Such a discretion is neither arbitrary nor capricious.

[6] Arbitrary and capricious powers are contrary to the genius of our government, are never favored and seldom granted. But where the power exists to prohibit the doing of an act altogether, there necessarily follows the power to permit the doing of the act upon any condition, or subject to any regulation, however arbitrary or capricious it may be, as the greater power includes the less.

[7] But there are certain inherent rights which men do not surrender by entering into organized society, and of which they cannot be arbitrarily deprived by the State. They are briefly summarized in general terms in section 1 of the Constitution of this State as follows: "That all men are by nature equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot by any compact deprive or divest their posterity, viz., the enjoyment of life and liberty with the means of acquiring and possessing property, and purchasing and obtaining happiness and safety."

They embrace all businesses that are legitimate in character and are of such nature as to indicate that they are inherent in the individual claiming them.

In *Cutrona* v. *Wilmington* (Del. Ch.) 124 Atl. 658, 663-4, it is said: "The right of dominion over one's own property, to use it as he sees fit so long as the rights of others are not infringed upon, is a right which not even the legislative power of the State can take from the individual. With respect to such proprietary interests, the extent of the State's power is that of regulation, and such regulation must be of a kind that operates impartially and alike upon all persons similarly situated. Regulation in matters of

this kind can never extend to the point of bestowing upon any official or officials the power to permit or deny, according as whim, fancy or favoritism may suggest, the enjoyment of the right by the individual. The equal protection of the laws guaranteed by the fourteenth amendment to the Constitution of the United States denounces all attempts to subject the property rights of individuals to the unrestrained discretion or control of administering officials, except in those special instances where the police power of the State may, within the appropriate field reserved to it, interpose its restraining arm."

The cases furnish many illustrations. *Yick Wo* v. *Hopkins*, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220; *Eubank* v. *Richmond*, 226 U. S. 137, 33 Sup. Ct. 76, 57 L. Ed. 156, 42 L. R. A. (N. S.) 1123; *Young* v. *Commonwealth*, 101 Va. 853, 45 S. E. 327; *State* v. *Tenant*, 110 N. C. 609, 14 S. E. 387, 15 L. R. A. 423, 28 Am. St. Rep. 715; *City of Richmond* v. *Dudley*, 129 Ind. 112, 28 N. E. 312, 13 L. R. A. 587, 28 Am. St. Rep. 180; *Cutrona* v. *Wilmington* (Del. Ch.), *supra*, and cases cited.

But this class of cases has no application to the inhibition or regulation of that which the claimant has no inherent right to do. This is well illustrated by the *Yick Wo Case*, which is the leading case on that subject. In that case it was held that the right of a person to conduct the laundry business on his own premises could not be made subject to the whim and caprice of the supervisors of the city of San Francisco, who could arbitrarily give or withhold consent not only as to places, but as to persons. While the right of the plaintiff to conduct a lawful business in a lawful way on his own premises was upheld, the result would have been different if he had insisted on doing the same

thing on the streets or sidewalks of the city, for here he had no such inherent right. The city is charged with the duty of using due care to keep its streets and walkways in a reasonably safe condition for use by the public, and this duty it could not perform if others had the right to obstruct them.

[8] The right to use the streets of a city as a common carrier for hire is a privilege and not an inherent right, and may be granted or refused by the city, in the exercise of its police power, at its pleasure. *Hadfield* v. *Lundin*, 98 Wash. 657, 168 Pac. 516, L. R. A. 1918-B, 909, Ann. Cas. 1918-C, 942; *State ex rel. Case* v. *Howell*, 85 Wash. 294, 147 Pac. 1159, Ann. Cas. 1916-A, 1231, and note; *Ex parte Dickey*, 76 W. Va. 576, 85 S. E. 781, L. R. A. 1915-F, 840.

In *Cutrona* v. *Wilmington* (Del. Ch.), 124 Atl. 658, 661-2, it is said: "No man has the right to use the public streets as a place wherein to carry on his private business. The streets are not constructed and maintained by the public for the purpose of supplying sites and facilities for carrying on private occupations. If it were otherwise, vendors of goods might with justice protest against all attempts to exclude them from the streets in the prosecution of the various businesses, notwithstanding the rights of the traveling public were being interfered with and traffic thereby obstructed. This complainant, in the operation of his busses, was engaged in using the streets of the city for the prosecution of a private business conducted thereon. So far as I have been able to discover the authorities are overwhelming to the effect that he has no inherent, no constitutional, right to carry on such a business. *Houston* v. *Des Moines*, 176 Iowa, 455, 156 N. W. 883; *Green* v. *San Antonio* (Tex Civ. App.), 178 S. W. 6; *Schoenfeld* v. *City of Seattle* (D. C.), 265 Fed. 726;

*Cummins et als.* v. *Jones,* 79 Or. 276, 155 Pac. 171; *Frick* v. *City of Gary* (Ind.), 135 N. E. 346; *Dent* v. *Oregon City,* 106 Or. 122, 211 Pac. 909; *Ex parte Dickey,* 76 W. Va. 576, 85 S. E. 781; L. R. A. 1915-F, 840; *Ex parte Parr,* 82 Tex. Cr. R. 525, 200 S. W. 404; *Harris* v. *Atlantic City,* 73 N. J. Law, 251, 62 Atl. 995.

"If this be so, I am unable to escape the conclusion that the power to regulate the use and exercise entire jurisdiction and control over the streets carries with it as a necessary implication the power to completely interdict a use which the streets were never intended to serve. The power existing to prohibit absolutely, and there being no requirement that it shall be exercised, it follows as a corollary that power also exists to permit the use. When this is said, terms and conditions upon which permission will be granted may be imposed, and those terms and conditions may very reasonably be such as concern the manner in which the proposed business shall be conducted. If this view be correct, then the matter presents itself not as an attempt primarily to regulate a business, but rather as an effort to do so in a secondary sense and only as incidental to the main purpose, which is to regulate the use of the streets over which entire jurisdiction and control are vested in the regulating body."

It was further said that "whenever the city authorities have power to prohibit a thing, they may as a condition for its enjoyment require that the consent of its properly designated officials shall be first obtained."

Again, "If the conclusion heretofore reached, viz., that the citizen has no inherent or proprietary right to use the streets for the prosecution of his private business, is correct, then the fact that the municipality chooses to provide for exceptions to a general prohibition in favor of those to whom it grants

consent, is not, under the principle of the foregoing cases, open to objection. It is true that such a situation is exposed to the danger of favoritism and prejudice. The evidence in this case, however, fails to indicate that these factors have operated to the prejudice of the complainant. He. was permitted to run his busses for nearly two years before the consent was withheld. The board justifies its refusal to issue new permits by the fact that the complainant, notwithstanding repeated warnings, refused or neglected to observe the regulations. They evidently regarded him as an unfit person to be allowed to operate his busses over the traffic laden streets of the city. During the period when he was allowed fifteen days of grace within which to operate after his 1923 permits had expired, he was convicted in the municipal court for violating the regulation with respect to adequate brakes, a particular in which great care ought to be exercised. Considering the dangers and hazards to which the public is exposed by the use of large busses, it is not unreasonable for the directors in control of the streets to take into consideration the character of the applicant for a permit before granting the same. Under the old method of regulating the business of selling intoxicating liquors by a license system, it was repeatedly held that discrimination based on personal fitness was permissible. The business of selling liquor being such as might be prohibited entirely, just as the business of operating busses might in the instant case be likewise prohibited, the principle is equally applicable in both cases, that discretion based on the personal qualifications of the applicant is not offensive to the fourteenth amendment."

In *Ex parte Dickey*, 76 W. Va. 576, 85 S. E. 781, L. R. A. 1915-F, 840, it is said: "The right. of a citizen

to travel upon the highway and transport his property thereon, in the ordinary course of life and business, differs radically and obviously from that of one who makes the highway his place of business and uses it for private gain, in the running of a stage coach or omnibus. The former is the usual and ordinary right of a citizen, a common right, a right common to all, while the latter is special, unusual and extraordinary. As to the former, the extent of legislative power is that of regulation; but as to the latter, its power is broader. The right may be wholly denied, or it may be permitted to some and denied to others, because of its extraordinary nature. This distinction, elementary and fundamental in character, is recognized by all the authorities."

In *Green* v. *San Antonio* (Tex. Civ. App.), 178 S. W. 6, it is said: "So in this case, appellant has never had any vested right to use the streets of San Antonio to engage in the business of a common carrier of passengers for hire, and no right of his is infringed or invaded by the ordinance requiring certain things to be done in order to enter into business on the streets, which have, at the expenditure of large sums, been placed by the city in prime condition for automobile travel. The streets belong to the public, the city being its trustee, and no private individual or corporation has a right to use such streets for the prosecution of a business without the consent of the trustee and a compliance with the conditions upon which the permission to use them is given."

*Hadfield* v. *Lundin*, 98 Wash. 657, 168 Pac. 516, L. R. A. 1918-B, 909, Ann. Cas. 1918-C, 942, contains a critical review of many of the cases on this subject. It is there said: "The streets and highways belong to the public. They are built and maintained at public

expense for the use of the general public in the ordinary and customary manner.   The State, and the city as an arm of the State, has absolute control of the streets in the interest of the public.   No private individual or corporation has a right to the use of the streets in the prosecution of the business of a common carrier for private gain without the consent of the State, nor except upon the terms and conditions prescribed by the State or municipality, as the case may be.   The use of the streets as a place of business or as a main instrumentality of business is accorded as a mere privilege and not as a matter of natural right."

After citing a number of cases, it is further said in the opinion:   "These cases, though involving regulatory statutes or ordinances, all recognize and are based upon the fundamental ground that the sovereign State has plenary control of the streets and highways, and, in the exercise of its police power, may absolutely prohibit the use of the streets as a place for the prosecution of a private business for gain.   They all recognize the fundamental distinction between the ordinary right of a citizen to use the streets in the usual way and the use of the streets as a place of business or main instrumentality of a business for private gain.   The former is a common right, the latter an extraordinary use.   As to the former, the legislative power is confined to regulation; as to the latter, it is plenary and extends even to absolute prohibition.   Since the use of the streets by a common carrier in the prosecution of its business as such is not a right, but a mere license or privilege, it follows that the legislature may prohibit such use entirely without impinging any provision either of the State or Federal Constitution."

The judge concludes his opinion on this subject as follows:

"If any proposition may be said to be established by authority, the right of the State, in the exercise of its police power, to prohibit the use of the streets as a place of private business or as the chief instrumentality in conducting such business, must be held so established. Nor can it be questioned that the power to prohibit includes the power to regulate, even to the extent that the regulation under given conditions may be tantamount to a prohibition. Where the power to prohibit exists, the reasonableness of any regulation is palpably a legislative question, pure and simple. To hold otherwise, would be to assert an absurdity. When the legislature acts within its constitutional authority in the exercise of the police power, the expediency of its action is not a question for the courts. In such a case, the power being once established, the legislature · determines, by the enactment itself, that the law is reasonable and necessary. *State* v. *Mayo*, 106 Me. 62 [20 Ann. Cas. 512], 75 Atl. 295, 26 L. R. A. (N. S.), 502."

[9] As the privilege prayed for in the petition for the mandamus lies in the reasonable discretion of the superintendent of police, it must be denied. Mandamus does not lie to control a discretionary power vested in any functionary.

The judgment of the trial court will be reversed, and an order will be entered in this court sustaining the demurrer of the city of Roanoke to the petition of the defendant in error for a mandamus, and dismissing said petition, with costs to the plaintiff in error in this court and in the trial court.

*Reversed.*