# Richmond

## EMIL ROBERT v. CITY OF NORFOLK.

October 11, 1948.

Record No. 3436.

Present, All the Justices.

*Norris E. Halpern*, for the plaintiff in error.

*Jonathan W. Old, Jr., M. T. Bohannon* and *Vernon D. Hitchings, Jr.*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Emil Robert, hereinafter referred to as the defendant, was convicted in the Police Court of the city of Norfolk

on a warrant charging him with "Soliciting magazines subscriptions on the public streets of the City of Norfolk without a permit, in violation of Sec. 886 of the Norfolk City Code," and fined $5 and costs.

Upon appeal to the corporation court of that city, the judgment was affirmed. Writ of error was granted by this court.

The ordinance in question is as follows:

"Sec. 886. Soliciting contributions or selling on street—permit required.

"Any person who may desire to use the streets, lanes, and other public places of the City for the purpose of soliciting contributions, or selling any articles or things for charitable or other purposes, shall first obtain a written permit from the Director of Public Safety so to do.

"Any person who shall use the streets, lanes and public places of the City for the purpose of soliciting contributions or selling any articles or things for charitable or other purposes, without first obtaining permission in writing from the Director of Public Safety, shall be liable to a fine of not less than five nor more than twenty dollars."

The facts are undisputed. The National Publishing Corporation is a California corporation, which maintains its office at Los Angeles, California. It is engaged in the business of publishing magazines and selling and distributing magazines, periodicals and newspapers. It publishes six magazines, including the "Sports Digest," "Fashion Parade," "Milady," and several types of trade journals. It sells subscriptions to its magazines and periodicals and to numerous other magazines and newspapers not published by it. The corporation has no office for the transaction of any business in Virginia, and no magazines or newspapers published in Virginia are sold by it.

The magazines, periodicals and newspapers which it publishes and distributes contain "articles which provoke thought, express opinions and disseminate ideas," according to the evidence.

Sales of subscriptions are made by a crew of salesmen

employed by the corporation, who move at irregular intervals from city to city. The defendant was a member of one of these crews operating in the city of Norfolk. At the time of his arrest, as an employee of the National Publishing Corporation, he was soliciting a subscription to the "Sports Digest" on the streets of Norfolk. He had not obtained a permit to solicit or sell such a subscription from the Director of Public Safety of the city. Sometime prior to his arrest, application for permits for him and other members of his crew had been made to the Director pursuant to ordinance section 886, and permits were refused.

The defendant, in the course of his activities, did not deliver any magazine, newspaper, or periodical. He merely sold a subscription which entitled the purchaser to the future delivery of the magazine, newspaper, or periodical ordered. This was done by making out an order form with the subscriber's name, address, and name of magazine desired, accepting from the purchaser cash in full or in part payment of the subscription price and giving to the subscriber a receipt for the amount paid, setting out the full price, and terms of payment of the balance, if any. The defendant's duty was then to turn over to the manager of his crew the completed subscription form and the money which he collected, less his commissions. In turn, the manager was to remit to the National Publishing Corporation in California the order and money turned in to him. The National Publishing Corporation then forwarded by mail directly to the subscribing purchaser the magazine published by it. If the subscription was for a magazine published by another, the latter in turn mailed its magazine directly to the subscriber. All publications are mailed from a point outside of Virginia to the address of the particular subscriber in Virginia or elsewhere.

The city admits by stipulation that its Director of Public Safety has uniformly refused to grant permits for the sale of subscriptions to magazines in the city, or for sales of articles of merchandise on the streets. No permit has ever been granted under section 886 of the city code. It further

admits that it has never enforced the provisions of the ordinance against the sale of newspapers on the streets of the city.

The defendant contends that the court erred in refusing to strike the evidence of the city and dismiss the warrant on the ground that section 886 of the city code is unconstitutional and invalid, in that, first, it unlawfully delegates legislative powers to an administrative officer; second, because it violates the guarantees of the Constitution of the United States and the Constitution of the State of Virginia respecting freedom of speech and of the press and denies due and equal protection of the law, under the 1st and 14th Amendments to the Constitution of the United States and sections 1, 11, and 12 of the Constitution of Virginia; and, third, because it is in conflict with the Commerce Clause of the Federal Constitution, subsection 3, section 8 of Article 1.

The city does not deny that the ordinance delegates complete and final authority to the Director of Public Safety to grant or refuse permits thereunder. It admits that as enforced the ordinance absolutely prohibits the granting of permits. It contends, however, that the defendant was engaged in using the streets as a place of business enterprise for gain, and that since the city has the power to prohibit the use of its streets for such purposes, it has the power to permit such use subject to any regulation however arbitrary or capricious it may impose as the condition for its enjoyment.

In support of its contention it relies upon what we said in *Taylor* v. *Smith*, 140 Va. 217, 124 S. E. 259; *Thompson* v. *Smith*, 155 Va. 367, 154 S. E. 579, 71 A. L. R. 604; and *Kizee* v. *Conway*, 184 Va. 300, 35 S. E. (2d) 99, with reference to the distinction between the right of a citizen to use the streets in an ordinary way and his right to use them as a place for a private business.

Whether we consider the ordinance as delegating arbitrary power to an administrative officer or as effecting absolute prohibition, as enforced, the result is the same, if the conduct of the defendant was within the exercise of his constitutional rights.

The ordinance is comprehensive with respect to soliciting contributions or selling anything of any nature for any purpose on the public streets. There is no restriction in its application with respect to time, place, persons, or nature of purpose. There is no restriction to methods which might be regarded as inconsistent with the maintenance of public order or as involving disorderly conduct, the molestation of its inhabitants, or interference with traffic. The ordinance prohibits the acts specified at any time, at any place, and in any manner without a permit from the Director of Public Safety. No distinction is made between a person who solicits contributions in the distribution of religious literature or other literature disseminating opinions and ideas, and a person who is engaged in a purely commercial enterprise for profit. It fails to declare the policy of the law and the legal principles, which are to control the discretion of the administrative officer. The policy to govern is left wide open to the uncontrolled discretion of the Director of Public Safety in each individual case. That officer may grant or deny a permit according to his whim. He may grant a permit one day to one person and deny a like permit to another person the following day. It authorizes the granting of such permits by an administrative officer without prescribing any standards or limitations by which he shall be guided. The provisions of granting are not determined or determinable from the terms of the ordinance. On its face, it delegates powers essentially legislative to an administrative officer, and gives to him arbitrary and capricious power to grant or deny a permit.

The streets and highways belong to the public. They are built and maintained at public expense for the use of the general public in the ordinary and customary manner. Municipalities, as arms of the State, have absolute control over the streets in the interest of the public. Municipal authorities, as trustees for the public, are charged with the duty of keeping the streets open and available for public use. Under the police power, they may lawfully regulate the conduct of those using the streets, so long

as legislation to this end does not abridge the constitutional liberty of persons rightfully upon the streets. *Schneider* v. *State of New Jersey* (1939), 308 U. S. 147, 60 S. Ct. 146, 84 L. Ed. 155.

· This then brings us to the question whether the defendant, in soliciting subscriptions on a public street to a magazine, published by his employer, which provoked thought, expressed opinions, and disseminated ideas, was exercising an inherent right, subject only to reasonable regulations, under the constitutional guarantees of freedom of the press.

The Constitution of the United States, Article 1 of the Amendments provides: "Congress shall make no law * * * abridging the freedom of speech or of the press; * * *." This is further strengthened by the 14th Amendment which provides that: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

Section 12 of the Constitution of Virginia provides: "That the freedom of the press is one of the great bulwarks of liberty, and can never be restrained but by despotic governments; and any citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right."

The Constitution of Virginia is broader than that of the United States in providing that—"any citizen may freely speak, write and publish his sentiments on all subjects."

■ In Webster's New International Dictionary (2d Ed.), the word "publish" is defined as meaning: "to bring before the public as for sale or distribution."

The constitutional guarantees of freedom of speech and the press as related to the question here involved are clearly stated and summarized in 40 Am. Jur., "Peddlers, Transient Dealers, and Solicitors," page 936, section 28.

■ The authorities recognize the fundamental distinction between the ordinary right of persons to use the street in the usual way and the use of the streets as a place of business for private gain. No private individual or corporation has a right to use the streets as a place for the prosecution of a

purely commercial enterprise. However, streets are natural and proper places for the dissemination of information and opinion by citizens. In numerous recent cases the Supreme Court of the United States, speaking with particular reference to municipal ordinances which have sought to restrict the right to sell or distribute periodicals, magazines, handbills and other printed matter of not objectionable content, has discussed the meaning and effect of the constitutional guarantees of freedom of speech and of the press on the public streets and elsewhere.

In *Lovell* v. *Griffin* (1938), 303 U. S. 444, 58 S. Ct. 666, 82 L. Ed. 949, Mr. Chief Justice Hughes, in holding invalid an ordinance which prohibited the distribution without a permit of "circulars, handbooks, advertising or literature of any kind, whether said articles are being delivered free or whether same are being sold," said that: "The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets * * *. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion * * *. 'Liberty of circulating is an essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' "

The case of *Schneider* v. *State of New Jersey, supra,* is strongly in point. That case involved the constitutionality of four separate municipal ordinances, three of which dealt directly with the right of freedom of the press on city streets. The fourth involved the distribution of religious literature; but the decision in the case turned upon freedom of the press. There the court said:

"Although a municipality may enact regulations in the interest of the public safety, health, welfare or convenience, these may not abridge the individual liberties secured by the constitution to those who wish to speak, write, print or circulate information or opinion.

"Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property, the pri-

mary purpose to which the streets are dedicated. So long as legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature, it may lawfully regulate the conduct of those using the streets. * * *

"It is suggested that the Los Angeles and Worcester ordinances are valid because their operation is limited to streets and alleys and leaves persons free to distribute printed matter in other public places. But as we have said, the streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."

In *Martin* v. *Struthers* (1943), 319 U. S. 141, 63 S. Ct. 862, 87 L. Ed. 1313, it was held that the right of freedom of expression and freedom of press embraces the right to distribute literature and the right to receive it, and that these rights are so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, they must be fully preserved.

In *Murdock* v. *Commonwealth of Pennsylvania* (1943), 319 U. S. 105, 63 S. Ct. 870, 891, 87 L. Ed. 1292, the single issue was the constitutionality of an ordinance which required religious colporteurs to pay a license tax as a condition to the pursuit of their activities. The alleged justification for the license tax was that the literature was distributed with a solicitation of funds. It was held that such donations "did not transform evangelism into a commercial enterprise any more than the passing of the collection plate in a church made the church service a business."

The decision in *Murdock* v. *Commonwealth of Pennsylvania, supra,* disposed of seven other cases involving the right of Jehovah's Witnesses to distribute religious literature on the streets. On the same day the Supreme Court also decided three other cases of like nature, *Martin* v. *Struthers, supra; Douglas* v. *Jeannette*, 319 U. S. 157, 63

S. Ct. 877, 882, 87 L. Ed. 1324; and *Jones* v. *Opelika*, 319 U. S. 103, 63 S. Ct. 890, 87 L. Ed. 1290. While these cases dealt principally with the exercise of the right of religious freedom, the court has repeatedly held that freedom of press, freedom of speech, and freedom of religion occupy the same preferred position under the Constitution. (303 U. S. 450, 58 S. Ct. 668; 308 U. S. 160, 60 S. Ct. 150; 319 U. S. 115, 63 S. Ct. 876).

See *Jamison* v. *Texas*, 318 U. S. 413, 63 S. Ct. 669, 87 L. Ed. 869, and *Follett* v. *McCormick*, 321 U. S. 573, 64 S. Ct. 717, 88 L. Ed. 938, 152 A. L. R. 317.

In *Winters* v. *People of State of New York*, decided March 29, 1948, 333 U. S. 507, 68 S. Ct. 665, 92 L. Ed. 654, the Supreme Court in declaring invalid an ordinance of the city of New York making it a misdemeanor to print, sell, distribute, etc., or have in one's possession, etc., any book, magazine, etc., principally made up of criminal news, police reports, or accounts of criminal deeds, etc., said that the principle of a free press covers distribution as well as publication. Construing the ordinance it said:

"A statute so vague and indefinite in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantees of free speech is void on its face, as contrary to the Fourteenth Amendment."

    ✻      ✻      ✻      ✻      ✻      ✻

"We do not accede to appellee's suggestion that the constitutional protection for a free press applies only to the exposition of ideas. The line between the informing and entertaining is too elusive for the protection of that basic right. Everyine is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine. Though we can see nothing of any possible value to society in these magazines, they are as much entitled to the protection of free speech as the best of literature."

It will be noted that in the above case Winters was in possession of certain magazines, falling within the classifica-

tion forbidden by the ordinance to be sold, distributed, or possessed with intent to sell for profit. Yet, the publication mentioned was held to be entitled to the immunity of freedom of the press.

In *Saia* v. *People of State of New York*, 334 U. S. 558, 68 S. Ct. 1148, 92 L. Ed. 1087, decided June 7, 1948, the Supreme Court, four judges dissenting, held invalid a city ordinance prohibiting the use of sound amplification devices on the public streets, except with permission obtained from the chief of police in case of news, matters of public concern and athletic activities, as infringing upon the right of free speech, in the absence of any standard prescribed for the exercise of the discretion of the chief of police.

The principle above announced and the rule of construction stated in *Winters* v. *People of State of New York*, *supra*, apply with equal force to the delegation of power in, and to the vagueness and uncertainty of the ordinance of the city of Norfolk, with respect to the punishment of incidents within the protection of the guarantee of freedom of the press.

In *Kizee* v. *Conway*, 184 Va. 300, at page 307, we said:

"It is true that with respect to the ordinary useful occupations, in which every person has the right to engage, and which a municipality has merely the power to regulate and license, the city can not arbitrarily grant a license to one applicant and refuse it to another. It must license all applicants who are able to comply with the reasonable regulations and restrictions imposed upon the occupation. 38 Am. Jur., Municipal Corporations, sec. 332, p. 23."

In *South Holland* v. *Stein* (1940), 373 Ill. 472, 26 N. E. (2d) 868, 127 A. L. R. 957, it was held that the obtaining of a permit to solicit or canvass for magazine subscriptions may not be required by a municipality under authority conferred upon it to license and regulate hawkers and peddlers. See Annotation 127 A. L. R. 962.

The city cites *Valentine* v. *Chrestensen*, 316 U. S. 52, 62 S. Ct. 920, 86 L. Ed. 1262; *Schneider* v. *State of New Jersey*, *supra*; and *Ex parte Mares* (1946), 75 Cal. App. (2d) 798, 171 P. (2d) 762, in support of its contention.

The facts in *Valentine* v. *Chrestensen, supra*, are wholly different from those here. There the court upheld an ordinance forbidding the distribution of handbills advertising a submarine and soliciting visitors to it where the purpose was sought to be camouflaged by accompanying expressions of opinion which could not have been lawfully prohibited. It took occasion, however, to say:

"This court has unequivocally held that the streets are proper places for the exercise of the freedom of communicating information and disseminating opinion, and that, though the states and municipalities may appropriately regulate the privilege in the public interest, they may not unduly burden or prescribe its employment in these public thoroughfares. We are equally clear that the Constitution imposes no such restraint on government as respects purely commercial advertising."

In *Schneider* v. *State of New Jersey, supra*, reliance is placed upon the following statement:

"We are not to be taken as holding that commercial soliciting and canvassing may not be subject to such regulations as the ordinance requires."

This language refers to the use of the streets for a purely business purpose and to the right to sell goods, wares, and merchandise thereon, but not to an activity such as the circulation or distribution of literature in the dissemination of information and opinion. The sale and distribution of such literature is not measured by the same standards which govern sales by hucksters or other merchants, or by occupations purely commercial and without basic connection with the exercise of the constitutional freedoms.

*Ex parte Mares, supra*, is a decision from a District Court of Appeals. The facts there are not like those here and the ordinance involved is substantially different from the one now under review. The ordinance of the city of Norfolk does not absolutely prohibit the activities therein specified on the ground of public safety and welfare. It undertakes to regulate them in the discretion of the Director of Public Safety without any declaration of policy and without any standards of limitation whereby he may be guided.

█ It is true that some of the foregoing cases deal with the imposition of license taxes. Required permits and license taxes in many instances differ in effect only as to dollars and cents. It makes little difference which is required as a pre-requisite to the enjoyment of an inherent right. The principle is the same as applied to the exercise of the con-stitutional freedoms. To require a censorship through a license tax or arbitary permission strikes at the very heart of the guarantees of freedom of the press.

█ We are not to be taken as holding that the city cannot enact reasonable rules and regulations against the obstruction of free movement of traffic upon its streets, public lanes, and sidewalks. It can prohibit the distribution of obscene, lewd, or indecent literature. It can protect from molestation those on the streets who do not desire to be detained. It may enact other reasonable regulations, which do not unreasonably interfere with the distribution of literature expressing opinions and views. It may make reasonable regulations which relate to the time, manner and place of distribution, but it cannot deny to its citizens the right to circulate and distribute, or to buy magazines and periodicals provoking thought and disseminating ideas, not contrary to good morals or the public welfare and safety. *Schneider* v. *State of New Jersey, supra.*

It is not easy to draw the line of distinction between the exercise of common rights and the enjoyment of privileges subject to grant. The decision in each case is dependent upon the particular facts involved. Under the facts of this case, the defendant was soliciting a subscription to a magazine published by his employer, which expressed opin-ions and disseminated ideas. He was convicted for that solicitation, and for that alone.

█ Liberty of the press embraces the circulation and distribution of magazines and periodicals as well as religious literature. The solicitation of a subscription to a magazine or periodical expressing opinions and disseminating views is merely a step and but one of the steps in its publication and circulation. The mere fact that a charge is made for

such literature does not remove the solicitation from the category of those activities which are included in the steps which lead to the full enjoyment of the rights guaranteed to a free press.

The ordinance within the scope of its language as interpreted by the trial court permits the punishment of incidents fairly within the protection of the guarantee of a free press. For the reasons given, we conclude that, as applied to the defendant's conduct, it is, therefore, void and he cannot be punished for acting without a permit.

In view of the conclusion which we have reached, we deem it unnecessary to consider the assignment of error that the ordinance is in conflict with the Commerce Clause of the Federal Constitution.

The judgment of the trial court is reversed and the warrant against the defendant is dismissed.

*Reversed and final judgment.*

STAPLES, J., concurring.

I concur in the conclusion reached in the opinion of the court that the judgment appealed from should be reversed and the warrant against the defendant dismissed. I would base this conclusion, however, solely upon the invalidity of the ordinance as an unlawful delegation of power to the Director of Public Safety, in that the granting of the permits referred to in the opinion is left to the uncontrolled discretion of the Director without prescribing any standards or limitations by which he shall be guided. This ground alone is sufficient to support the conclusion reached and renders it unnecessary to decide the question of the rights of the defendant under the provisions of the Constitution of the United States relating to the exercise of the rights of free speech and freedom of the press. It is my view that the decision of the court as to rights of a person to use the streets of a municipality by virtue of said constitutional provisions operates as an unjustified restriction upon the powers of the State and its municipalities. Since it is un-

necessary to decide this constitutional question, I think we should refrain from its consideration in this case, particularly in view of the fact that the State is not a party and we have not had the benefit of any expression from the Attorney General with respect thereto.